IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 97-31345

---

KESTUTIS ZADVYDAS,

                                        Petitioner-Appellee,

          versus

LYNNE UNDERDOWN; U.S. IMMIGRATION
AND NATURALIZATION SERVICE,

                                        Respondents-Appellants.

---

Appeal from the United States District Court for the
Eastern District of Louisiana

---

August 11, 1999

Before GARWOOD, DAVIS, and BARKSDALE, Circuit Judges.

GARWOOD, Circuit Judge:

     Petitioner-appellee Kestutis Zadvydas (Zadvydas) applied for
a writ of  habeas corpus pursuant to 28 U.S.C. § 2241.  He alleged
that since he is a stateless person and there is no possibility of
effectuating his deportation to another country, his continued
detention by respondents-appellants the Immigration and
Naturalization Service (INS) and its district director (whose
successor, Lynne Underdown, has been substituted as a party
respondent-appellee) constitutes punishment without due process of
law and thus violates his due process rights and international law.

The district court granted the writ and ordered Zadvydas released from custody.  *Zadvydas v. Caplinger*, 986 F.Supp. 1011 (E.D. La. 1997).  We reverse.

## Facts and Proceedings Below

Zadvydas was born in a displaced persons camp in Germany in 1948.  In 1956 he immigrated with his family to America, and became a resident alien.  Despite his long residence in this country, he never became a citizen.[1]  Starting as a youth, Zadvydas developed an extensive criminal history.  His FBI records indicate numerous arrests.  In 1966 he was convicted of attempted robbery in New York.  In 1974 he was again convicted in New York, this time of attempted burglary.  The INS began the process of deportation in 1977, based on these two convictions. While those proceedings were pending, Zadvydas was released into the community.  After a lengthy delay, Zadvydas' motion for relief from deportation under 8 U.S.C. § 1182(c) was denied on February 10, 1982.  Facing a hearing before an immigration judge that year, Zadvydas disappeared.  Over the next decade, the INS failed to locate Zadvydas.

In 1987, authorities in Virginia arrested Zadvydas for possessing 474 grams of cocaine with intent to distribute. According to his own testimony, Zadvydas used cocaine at that time. While on bail awaiting trial in Virginia, Zadvydas fled to Houston, Texas. After several years in Texas, Zadvydas voluntarily presented himself to Texas authorities, and he was subsequently tried in

---

[1]     The record does not reveal whether Zadvydas ever applied for citizenship.

2

Virginia on the 1987 distribution charge. In 1992, he was convicted and sentenced to sixteen years' imprisonment, with six years suspended. After serving only two years, Virginia released him on parole. The INS promptly took him into custody and reinitiated deportation proceedings. In March 1994 the immigration judge ordered that Zadvydas should be detained without bond during the deportation process based on his history of flight from authorities. Zadvydas appealed that determination, but the Board of Immigration Appeals (BIA) affirmed the immigration judge.

In 1994 Zadvydas appeared before the immigration judge. He admitted his past criminal history, conceded deportability, and seemed to indicate that he was a German citizen. He applied for relief from deportation under 8 U.S.C. § 1182(c). In May 1994 the immigration judge denied relief from deportation and ordered Zadvydas to be deported. Zadvydas did not appeal that decision, does not challenge it here, and it has become final. The INS immediately contacted the German government to arrange for deportation. German officials, however, proved unwilling to accept Zadvydas. They took the position that under German law the mere fact Zadvydas was born on German soil did not automatically entitle him to German citizenship. The INS, while continuing to forward requests to Germany, contacted Lithuanian authorities in July 1994. The Lithuanians tersely responded that they could not accept Zadvydas since he was neither a citizen nor a permanent resident of Lithuania.

In May 1995, after the INS had forwarded to German authorities

all the material they believed was necessary to establish Zadvydas' citizenship, the German authorities declined to accept Zadvydas. Referencing extensive research that they assertedly had conducted, they declared that Zadvydas was not a German citizen and thus could not be deported to Germany. Subsequent communications with the German authorities apparently did not generate a response. Based on the fact that Zadvydas' wife is a citizen of the Dominican Republic, the INS apparently wrote Dominican authorities. No Dominican response is in the record. In October 1996, the INS again contacted Lithuania to ascertain whether Zadvydas could claim citizenship. The Lithuanian government has since responded by stating that Zadvydas, while not one of their citizens, could apply for citizenship if he could prove that both of his parents were born in Lithuania prior to 1940. In letters dated October 26, 1998, and March 25, 1999, the Lithuanian government has broadly outlined the type of documentation it would require, and stated that Zadvydas should present such materials to it.

In September 1995, Zadvydas filed the instant petition for a writ of habeas corpus under section 2241, claiming that his continued detention violated the Eighth Amendment, the due process clause, and international law. In February 1997 the magistrate judge recommended denial of Zadvydas' habeas petition. Zadvydas filed objections. In November 1997 the district court found that continued detention of Zadvydas was unconstitutional. The court rejected all of Zadvydas' challenges to his deportation and the

4

denial of his request for relief under section 1182(c), and it further ruled that his continued detention was authorized by 8 U.S.C. former § 1252(a)(2)(B) because he had not shown "that he is not a threat to the community and that he is likely to appear at any scheduled hearing." 986 F.Supp. at 1024.[2] However, concluding that Zadvydas was "stateless" and thus could "never be deported because there is no place to send him", the court held that Zadvydas could not be "permanently incarcerated" without violating his substantive due process rights. While the INS had procedures to review continuing detention, and Zadvydas thus could possibly be released in the future, the court discounted this possibility, finding that in practice there was "no end in sight" for Zadvydas' detention. 986 F.Supp. at 1027. The court ordered Zadvydas released under a list of conditions it generated. The INS timely appealed.[3] While this appeal has been pending, Zadvydas seems to

---

[2] Former section 1252(a)(2)(B) provided:

> "The Attorney General may not release from custody any lawfully admitted alien who has been convicted of an aggravated felony, either before or after a determination of deportability, unless the alien demonstrates to the satisfaction of the Attorney General that such alien is not a threat to the community and that the alien is likely to appear before any scheduled hearings."

The district court further observed in this connection that the INS had also interviewed Zadvydas and reviewed his file and determined not to then release him under the similar standards of the Transition Period Custody Rules pursuant to section 303(b)(3)(B) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. 986 F.Supp. at 1024-5 n.4. The INS had determined thereunder that Zadvydas was "a threat to security as well as a flight risk."

[3] Zadvydas has not cross-appealed.

5

have complied with the district court's release conditions and has apparently conducted himself as a productive member of society.

## Discussion

The district court found that given the uncertainty that any nation would be found that would accept Zadvydas, his detention was indefinite. It further found that such indefinite detention violated his substantive due process rights. The law, at least in this Circuit, regarding the long-term detention of excludable aliens pending deportation is clear—such detention is allowable. *See, e.g.*, *Gisbert v. U.S. Attorney General*, 988 F.2d 1437, 1448 (5th Cir. 1993). Zadvydas argues, however, that these cases can have no application to his status since he is a resident alien and thus can claim enhanced constitutional protection. He maintains that even if the government may detain an excludable alien indefinitely, it violates substantive due process to inflict such detention on a resident alien such as himself.[4] The INS argues, however, that once a resident alien such as Zadvydas is—concededly in adherence with procedural and substantive due process—ordered deported and that order becomes final, the resident alien may claim

_____

[4] Zadvydas also claims that his continued detention violates both international treaties and customary international law proscriptions of arbitrary detention. We do not believe that the continued detention here could be described as arbitrary. In any case, we rejected an identical international law claim in *Gisbert*. *See Gisbert*, 988 F.2d at 1448. We are unaware of any presently relevant distinction in international law between excludable and resident aliens, so for the purposes of adjudicating the application of international law *Gisbert* is directly controlling. Zadvydas' claims that his procedural due process and Eighth Amendment rights are violated by his continued detention were expressly not reached by the district court (986 F.Supp. at 1027 n.6) and were not argued before us. We do not address them here.

6

no greater rights than an excludable alien in like circumstances. To the extent that the circumstances of this case require us to follow their logic, we agree with the INS.

I. Preliminary Matters

As a threshold matter, we must address the question of this Court's jurisdiction. Although the INS contested the district court's jurisdiction below, it has not done so on appeal. We must nevertheless examine our own jurisdiction independently before proceeding. *See Arizonans for Official English v. Arizona*, 117 S.Ct. 1055, 1072 (1997). Congress has clearly indicated that it desires minimal judicial intrusion into deportation decisions. The strictest jurisdictional standard under which Zadvydas' claims could be evaluated are provided by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 309-546, which repealed the prior judicial review schemes governing immigration and substituted new provisions potentially applicable to Zadvydas. *See* 8 U.S.C. § 1252(g).[5] The Supreme Court has recently construed the jurisdictional effect of section 1252(g). *See Reno v. American-Arab Anti-Discrimination*

---

[5] Section 1252(g) provides:

"(g) Exclusive Jurisdiction

Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

7

*Committee*, 119 S.Ct. 936 (1999).  In *Reno*, the Court held that the enactment was not a general bar, but rather limited judicial review of a narrow class of discretionary executive actions.  By the statute's terms, one of the actions immune from review is an action to "execute removal orders against any alien under this chapter."  In a recent case, the Seventh Circuit has held that these provisions do not remove our jurisdiction to hear a section 2241 habeas petition challenging the validity of the statutes authorizing the detention of aliens.  This is because the detention, while intimately related to efforts to deport, is not itself a decision to "execute removal orders" and thus does not implicate section 1252(g) under *Reno*.  *See Parra v. Perryman*, 172 F.3d 954, 957 (7th Cir. 1999).  We agree, and find jurisdiction to hear this appeal.

We next must address the statutory regime governing Zadvydas' continued detention.  Zadvydas was released into INS custody in 1994.  Since that time, a flurry of statutory changes have taken place.  Zadvydas' detention could be covered by one of four separate detention regimes, depending on the degree of retroactivity involved.  Two of them, the rule in place when he was initially detained, *see* 8 U.S.C. § 1252 (1994), and the Transition Period Custody Rules authorized in IIRIRA, place the burden on a detainee awaiting deportation to prove that he is not a danger to the community or a flight risk before being released on parole pending deportation.  The third, most recent, provision—IIRIRA's permanent provision—authorizes detention but makes it discretionary

8

beyond an initial ninety day period. *See* IIRIRA § 305(c), *codified as* 8 U.S.C. § 1231(a)(6), Immigration and Nationality Act (INA) § 241 (a)(6).[6] From a constitutional perspective, the choice between these regimes appears to be of at most marginal import. However, the rules established by the immigration provisions of the Anti-Terrorism and Effective Death-Penalty Act (AEDPA) order mandatory detention of all aliens awaiting deportation, regardless of danger or flight risk. *See* AEDPA, Pub. L. 104-132 § 440(c), 110 Stat. 1214, 1277 (amending 8 U.S.C. § 1252(a)(2) to delete provisions allowing release of nondangerous nonflight-risk detainees).

The parties agree that AEDPA § 440(c) does not apply, and both maintain that this case is governed by the new section 241 established by the IIRIRA, which they argue applies to all aliens who are not "in proceedings" at its effective date. It would seem clear that Zadvydas is not in deportation proceedings—the order regarding his deportation was issued and became final long before IIRIRA's effective date, and only the physical act of deportation remains undone. Moreover, the rapid passage of IIRIRA in the immediate wake of AEDPA seems to indicate that Congress repudiated the harsh mandatory detention regime created by AEDPA for aliens whose deportation is final. To apply AEDPA to Zadvydas based solely on the accident of when proceedings against him began would seem to make little sense—there is no reason to suspect that Congress determined that aliens in custody prior to the effective

---

[6]    Certain classes of aliens, including criminal aliens such as Zadvydas, "may be detained beyond the [90 day] removal period."  8 U.S.C. § 1231(a)(6).

date of IIRIRA were, as a class, significantly more dangerous than those subsequently taken and thus merited harsher treatment. While the statute currently is not a model of clarity[7] in respect to its retroactive application to an alien in Zadvydas' position, we find the INS' construction reasonable. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843-44 (1984). We conclude that Zadvydas' detention is governed by the new provisions of section 241.

Because we agree with the parties that new INA section 241 applies, we will proceed to analyze the constitutional question presented under the assumption that Zadvydas will be able to obtain periodic review of his detention. Under INA § 241(a)(1) & (2), 8

---

[7]     IIRIRA's retroactivity clause, section 309(c)(1), bars application of its provisions "in the case of an alien who is in exclusion or deportation proceedings before" its effective date. The statute's section dealing with retroactivity is generally phrased in the present tense. The title to the section is, for example, "Transition for Aliens in Proceedings," and the clause applies to an alien who "is in" proceedings at the effective date. The natural reading of the clause would thus seem to be that it applies only to proceedings that are pending as of the effective date. *See American-Arab*, 119 S.Ct. at 943 (defining transitional cases under section 309(c)(1) as "cases pending on the effective date of IIRIRA"). *See also id*. at 945 (referring to "§ 309(c)(1)'s general rule" that IIRIRA's provisions "do not apply to pending cases"). The problem is created by the statute's usage of "before," which might be read to imply that the statute only affects those that were free of any involvement in deportation proceedings prior to the effective date. The confusing "before" was, however, the product of what was labeled as a "technical" amendment established by the Hatch-Kennedy amendment to the H-1A Nursing Bill. See Pub. L. 104-302, 110 Stat. 3657. Nothing indicates what the goal of this amendment was, and the failure of the amendment to change the surrounding language makes its intended purpose unclear. Accordingly, we find the text ambiguous enough to merit consideration of *Chevron*, particularly in light of the seeming absurdity of a contrary result and the constitutional problems it might possibly create.

10

U.S.C. § 1231(a)(1) & (2), the Attorney General is required to remove an alien from the United States within the "removal period," defined generally as the ninety days beginning when an order of removal becomes administratively final, when any judicial review thereof is completed, or when the alien is released from confinement (other than under an immigration process), whichever is latest, and is required to detain the alien during the removal period. If the alien is not removed within the removal period, "the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General." *Id*. § (a)(3). INA § 241(a)(6), 8 U.S.C. § 1231(a)(6) provides:

> "An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2)[8], or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, *may* be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)." (Emphasis added).

INS regulations, *see* 8 C.F.R. §§ 236.1(d)(2)(ii), 236.1(d)(3)(iii), 241.4 & 241.5, as explained and expounded in the February 3, 1999, "Memorandum for Regional Directors" from INS Executive Associate Commissioner Michael A. Pearson concerning "Detention Procedures for Aliens Whose Immediate Repatriation Is Not Possible or Practicable," authorize the release of such aliens when it is determined that the alien "is not a threat to the community and is likely to comply with the removal order," and further provide that

---

[8] 8 U.S.C. § 1227(a)(2), INA § 237(a)(2), includes aliens, such as Zadvydas, convicted of an aggravated felony or a controlled substance violation.

11

the alien must be given the opportunity to so demonstrate, that every six months the District Director must "review the status of" such "aliens . . . to determine whether there has been a change in circumstances that would support a release decision," that the alien's file must be documented to show "the reasons for the custody or release decision," and that "if the alien submits a written request to have his detention status reviewed by the District Director . . . the alien may appeal the District Director's decision to the Board of Immigration Appeals."[9]

---

[9] The Pearson memorandum states in pertinent part:

". . . 8 C.F.R. § 241.4 gives the District Director the authority to make release decisions beyond the removal period based on specific criteria in the regulation as set forth below. The regulation also provides that the District Director should provide an alien with the opportunity to demonstrate by clear and convincing evidence that he is not a threat to the community and is likely to comply with the removal order. The alien may be given this opportunity in writing, orally, or a combination thereof. The District Director must ensure that the file is documented with respect to the alien's opportunity to present factors in support of his release, and the reasons for the custody or release decision.

. . .

Every six months, the District Director must review the status of aliens detained beyond the removal period to determine whether there has been a change in circumstances that would support a release decision since the 90 day review. Further, the District Director should continue to make every effort to effect the alien's removal both before and after the expiration of the removal period. The file should document these efforts as well.

. . .

District Directors are advised that a detention review is subject to the provisions of 8 C.F.R. § 236.1(d)(2)(ii) if the alien submits a written request to

12

have his detention status reviewed by the District Director. Under 8 C.F.R. § 236.1(d)(2)(iii), the alien may appeal the District Director's decision to the Board of Immigration Appeals. Where the alien has not made a written request to have his custody status reviewed, however, there is no provision for appeal of the District Director's decision to the Board of Immigration Appeals. See 8 C.F.R. § 241.4."

8 C.F.R. § 241.4(a) provides:

"(a) *Continuation of custody for inadmissible or criminal aliens.* The district director may continue in custody any alien inadmissible under section 212(a) of the Act or removable under section 237(a)(1)(C), 237(a)(2), or 237(a)(4) of the Act, or who presents a significant risk of noncompliance with the order of removal, beyond the removal period, as necessary, until removal from the United States. If such an alien demonstrates by clear and convincing evidence that the release would not pose a danger to the community or a significant flight risk, the district director may, in the exercise of discretion, order the alien released from custody on such conditions as the district director may prescribe, including bond in an amount sufficient to ensure the alien's appearance for removal. The district may consider, but is not limited to considering, the following factors:

(1) The nature and seriousness of the alien's criminal convictions;
(2) Other criminal history;
(3) Sentence(s) imposed and time actually served;
(4) History of failures to appear for court (defaults);
(5) Probation history;
(6) Disciplinary problems while incarcerated;
(7) Evidence of rehabilitative effort or recidivism;
(8) Equities in the United States; and
(9) Prior immigration violations and history."

The release of an alien under section 241.4 shall be under a supervision order requiring, *inter alia*, periodic reporting to the INS, continued efforts to obtain travel documents, advance approval of travel beyond any therein specified limits, and giving notice of change of address; a bond may also be required; and, the INS "may grant employment authorization to an alien" released under section 241.4. *See* C.F.R. § 241.5.

13

The district court found that the INS did not err in determining that Zadvydas posed a danger to the community and a flight risk. Should Zadvydas no longer do so, he would doubtless be released.

II. *Gisbert* and Excludable Aliens

Article 1, section 8, clause 4 of the Constitution vests in Congress the power to "establish an uniform Rule of Naturalization." Moreover, "[t]he exclusion of aliens is a fundamental act of national sovereignty" that "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *See United States ex rel. Knauff v. Shaughnessy*, 70 S.Ct. 309, 312 (1950). *See also Chae Chan Ping v. United States*, 9 S.Ct. 623, 630 (1889) (discussing sovereignty justification). The basic source of this interest is identical regardless of whether the government seeks to exclude an alien who has not entered, or to expel an alien who has resided here. *See Fong Yue Ting v. United States*, 13 S.Ct. 1016, 1019 (1893) ("The right of a nation to expel or deport foreigners who have not been naturalized . . . is as absolute and unqualified, as the right to prohibit and prevent their entrance into the country."). When these principles are taken together, it is clear that "the power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 97 S.Ct. 1473, 1478 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei*, 73 S.Ct. 625, 628 (1953)). *See also Harisiades v.*

14

*Shaughnessy*, 72 S.Ct. 512, 519 (1951) ("It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches as to be largely immune from judicial inquiry or interference."). The power of the national government to act in the immigration sphere is thus essentially plenary.

Aliens can of course claim some constitutional protections. The language of the due process clause refers to "persons," not "citizens," and it is well established that aliens within the territory of the United States may invoke its provisions. *See, e.g., Yick Wo v. Hopkins*, 6 S.Ct. 1064, 1070 (1886); *Wong Wing v. United States*, 16 S.Ct. 977, 981 (1896) (illegal resident alien could not be punished by sentence to hard labor without due process of law). While the cases have drawn a line for some purposes between excludable aliens who failed to effect entry into the country unimpeded and resident aliens, in this Circuit it is clear that the former also can be considered persons entitled to protection under the 14th Amendment. *See Lynch v. Cannatella*, 810 F.2d 1363, 1375 (5th Cir. 1987) ("Excludable aliens are not non-persons."). We cannot suppose that the result in *Wong Wing* would have been different had the alien there been excludable rather than resident.

However, alien status can affect our analysis of constitutional rights. Because of their special position, certain

15

classifications and restrictions that would be intolerable if applied to citizens are allowable when applied to resident aliens. *See, e.g., Cabell v. Chavez-Saldino*, 102 S.Ct. 735, 740 (1982) (state's exclusion of resident aliens from basic governmental functions did not violate the constitution).[10] *See also DeCanas v. Bica*, 96 S.Ct. 933 (1976). More importantly for the issue before us, courts have long recognized that the governmental power to exclude or expel aliens may restrict aliens' constitutional rights when the two come into direct conflict. *See Matthews v. Diaz*, 96 S.Ct. 1883, 1891 (1976) ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens."). Indeed, the Court has accepted collateral damage to the constitutional rights of citizens as an acceptable price to pay in deference to the plenary power over aliens of the political branches of the national government. *See Kleindienst v. Mandel*, 92 S.Ct. 2576, 2582-84 (1972) (recognizing citizen audience had First Amendment interest in listening to communist agitator, but accepting government's exclusion of alien speaker despite this interest). *See also United States v. Williams*, 24 S.Ct. 719 (1904).

Zadvydas claims that his detention amounts to punishment without trial, and thus violates his substantive due process

---

[10] Further, "the Fourteenth Amendment's limits on state powers are substantially different from the constitutional provisions applicable to the federal power over immigration and naturalization." *Mathews v. Diaz*, 96 S.Ct. 1882, 1895 (1976). Thus, provisions in state laws respecting aliens which would be invalid under the Fourteenth Amendment are not necessarily invalid when contained in federal legislation. *Id*. at 1893-95.

liberty interest. It is well established that resident aliens may not be punished in this manner. *See Wong Wing*, 16 S.Ct. at 981. However, the *Wong Wing* court distinguished between the unconstitutional act before it—which made illegal presence in the country summarily punishable by a sentence to being "imprisoned at hard labor" for not more than a year and provided that the alien would be "*thereafter* removed from the United States" (emphasis added)—and detention pending deportation. "Proceedings to exclude or expel would be in vain if those accused could not be held in custody pending the inquiry into their true character, and while arrangements were being made for their deportation." *Id.* at 980. We have clearly held that *excludable* aliens may be detained pending deportation without such detention constituting unconstitutional punishment, even when the aliens' country of origin indicates it will not accept their return. *See Gisbert v. U.S. Attorney General*, 988 F.2d 1437, 1448 (5th Cir. 1993). *See also Barrera-Echavarria v. Rison*, 44 F.3d 1441, 1450 (9th Cir. 1995) (*en banc*) (accord with *Gisbert*).

*Gisbert* dealt with the detention of a group of Cubans who were part of the Mariel boatlift. After detaining these aliens prior to entry—thus ensuring that they were excludable aliens—the United States decided that they should be returned to their country of origin. Castro refused to accept their return, however, and the aliens were released on immigration parole. Due to the working of

17

the "entry fiction,"[11] the aliens retained their excludable status despite their freedom on American soil. All of the aliens in *Gisbert* then committed, and were convicted of, crimes while on parole. After their release from the criminal justice system, the aliens were detained pending deportation to prevent any further criminal acts. In *Gisbert*, as under the provisions here, there was a procedure that allowed the detained alien to be released from detention while deportation was still impractical. *See id.* at 1443 n.11 (detailing annual review procedures that allowed release of aliens found not to present a danger to the community).

The aliens did not challenge the conditions of their confinement or the procedures used in the initial decision to deport them. They instead argued that their continued confinement constituted punishment without a criminal trial and thus violated their substantive due process rights. They emphasized the fact that in light of Castro's refusal to accept their deportation, their confinement was potentially indefinite. We rejected these arguments and held that the continued, indefinite detention of the aliens did not violate their constitutional rights. In reaching this result, we relied on the Court's decision in *Mezei*, in which it allowed the indefinite detention of an excludable alien who had been ordered permanently excluded and could find no nation to receive him. *See Mezei*, 73 S.Ct. 625. Drawing on the reasoning of

---

[11]     The fact that, for humanitarian or administrative reasons, the government chooses to allow excludable aliens into the country while their cases are pending does not alter their status if they were initially properly detained at the border. *See, e.g., Ahrens v. Rojas*, 292 F.2d 406, 410 (5th Cir. 1961).

*Mezei*, we found that detention pending deportation does not constitute punishment, since the detention could rationally be seen as a necessary byproduct of the need to expel an unwanted alien rather than a punitive decision. *Gisbert*, 988 F.2d at 1442. The continued detention of Mariel Cubans thus did not constitute punishment without trial in violation of the aliens' substantive due process rights, even though there was no guarantee that deportation could be effectuated in the near future.

Zadvydas attempts to distinguish *Gisbert* and *Mezei* on the ground that he is a resident alien, and thus is entitled to a greater degree of substantive due process protection than the excludable aliens in those cases. Zadvydas' resident alien status surely entitled him to greater *procedural* rights in the determination of whether he was entitled to remain in the United States than were granted the excludable aliens in those cases. However, Zadvydas does not challenge here the procedures used by the government in deciding to deport him, or the final result. His only complaint is with the detention itself. As explained in part IV below, we do not believe that the difference between excludable aliens and resident aliens mandates a radical departure from the reasoning of *Gisbert* when, as here, a final decision to deport the once resident alien has been made and stands unchallenged.

III. Permanent Confinement

The district court held that Zadvydas' detention violated his substantive due process rights because it constituted "permanent confinement" in that he "will never be deported because there is no

place to send him." 986 F.Supp. at 1026, 1027. We conclude that these reasons considerably overstate the matter.

To begin with, Zadvydas may be released when it is determined that he is no longer either a threat to the community or a flight risk, and he is entitled to automatic review of his case for this purpose every six months, with opportunity to present factors in support of his release, and, where his written application for release has been denied by the district director, he may appeal that decision to the BIA. See note 9, *supra*, and accompanying text. In *Barrera-Echavarria*, the en banc Ninth Circuit concluded that analogous annual INS administrative review for release under similar standards precluded characterization of the alien's detention as "'indefinite' or 'permanent.'" 44 F.3d at 1450.[12]

Nor can it now be said with any real assurance that Zadvydas "will never be deported." To be sure, it is clear that due to an unfortunate combination of circumstances, locating a country to which Zadvydas may be deported has been and will be difficult at best; but that there is no meaningful possibility of doing so has not been clearly established. And, precisely because of the complexities involved, more time than usual will doubtless in any event be required.

The problem of deporting Zadvydas has its roots in the tortured twentieth century history of what is now Lithuania. Up until the German defeat in World War One, portions of Lithuania

---

[12]    We also note that at a certain point—which Zadvydas may be approaching—age alone would likely weigh heavily against an INS finding of continued danger to the community or flight risk.

20

were located in Germany.  Zadvydas' mother was born in that section of modern Lithuania—then known as the Memel region, now called Klaipeda—in 1919.  Six years earlier (according to his own account in an affidavit prepared to secure his post-war immigration to America), Zadvydas' father had been born in Mazeikiai, which is located on the Baltic coast outside of the disputed Memel region and thus would presumably have been under Russian control at the time of his birth.  As part of the Versailles Treaty, Germany ceded the Memel region to the Allies.  Lithuania, having renewed its existence as an independent state, successfully laid claim to the area and occupied it in 1923.  At that point, Zadvydas' mother and father presumably would both have been Lithuanian citizens, since they were apparently born within the resurrected nation's current borders.

However, in 1939 Germany issued an ultimatum to Lithuania demanding the return of the Memel region, referencing the alleged plight of ethnic Germans under Lithuanian rule.  The territory was then handed back to Germany, and (if she was still living in the region) Zadvydas' mother then would have become a subject of Nazi Germany.  Unlucky in neighbors, Lithuania then had its independence extinguished by Stalin's 1940 invasion, which placed Zadvydas' father in the Soviet orbit (again, presuming he lived near his claimed home town at the time). *See generally* Algimantas Gureckas, *Lithuania's Boundaries and Territorial Claims Between Lithuania and Neighboring States*, 12 N.Y.L. Sch. J. Int'l & Comp. L. 107 (1991). Hitler then invaded the Soviet Union in 1941, and Lithuania was

21

under German occupation for most of the Second World War. Late in that conflict, the Soviet army reoccupied Lithuania. The Soviets did not reestablish the Lithuanian independence they had earlier snuffed out, and Lithuania remained a captive to Soviet tyranny until 1991. In the midst of all this, Zadvydas' parents were married in 1943. At some point, the couple moved (or fled) to Germany, where their first child was born in 1944. The family spent the immediate post-war years in displaced person camps in Germany. On Nov. 21, 1948, Zadvydas was born in one of these camps. In 1956 the family immigrated to America.

Due to these events, Zadvydas may in a sense be stateless. While born in Germany, he cannot claim German citizenship on that basis alone, because under German law citizenship hinges on blood (*jus sanguinis*) rather than place of birth (*jus soli*). Lithuania would seem to be the obvious alternative. Lithuanian *sanguinis* may be able to substitute for Zadvydas' birth outside of Lithuania. According to the communications from the Lithuanian government, Zadvydas can apply for Lithuanian citizenship if both his parents were born in Lithuania prior to the Soviet invasion in 1940.[13]

---

[13] Lithuania's citizenship laws are apparently designed to give preference to ethnic Lithuanians over the large number of ethnically Russian immigrants who established themselves in the years of communist occupation. The requirement of proving birth of one's ancestors in Lithuanian territory neatly differentiates the two populations. *See* Ruta M. Kalvaitis, *Citizenship and National Identity in the Baltic States*, 16 Bos. U. Int'l L. J. 231 (1998). This seems to be merely a variant of the *jus sanguinis* principal. It should be noted that the blood citizenship laws that must be navigated here would appear to administratively function somewhat differently from American birth citizenship laws. Because birth alone is not sufficient, it appears that under Lithuanian practice one (or one's parents) has to affirmatively apply for citizenship.

According to their own accounts, both parents would qualify under this standard. The difficulty that has so far delayed the process seems to be the need to document this fact. There is a baptismal certificate indicating his mother's birth in the Memel region, which is now part of Lithuania.[14] However, there is no corresponding documentation demonstrating that Zadvydas' father was born in Mazeikiai. The only evidence that has been unearthed up to this point is his affidavit upon entering the United States, which claimed birth in Lithuania.

The Lithuanian government, in letters dated October 26, 1998, and March 25, 1999, indicated that Zadvydas might apply for citizenship, but would have to personally and formally request it, and present documentation of his parent's birth. The INS had previously presented most of the available documentation—the

The fact that Lithuania is asserting that Zadvydas must apply for citizenship may thus not be unusual. It does seem to have caused some confusion in the communications between the INS and Germany and Lithuania. The INS continually asked for confirmation that Zadvydas *was* a citizen, rather than framing the matter as an application for citizenship. Given the circumstances of Zadvydas' birth, it would seem unlikely that his parents paused to put him in the national registry of either country. While perhaps understandable, this confusion may have slowed the process here.

[14] Zadvydas attempts to argue that the fact that at the time Zadvydas' mother was born the status of the Memel region was unsettled indicates that she could not claim Lithuanian citizenship. Nothing in the record supports this theory, and it would seem contrary to ordinary practice. *See Restatement Third, Restatement of the Foreign Relations Law of the United States* § 208, comment c; *id*. Reporters' Note 3 ("Normally, the transfer of territory from one state to another results in a corresponding change in nationality for the inhabitants of that territory"). While there is some evidence that Zadvydas's mother considered herself stateless, or German, this may not accurately track Lithuanian nationality law.

23

baptismal certificate and Zadvydas' father's affidavit—in its communications with Lithuania.  It is not clear, however, whether these materials were examined by the Lithuanians as support for an application for citizenship, rather than as part of a claim that Zadvydas already possessed citizenship.  Certainly there has been no definitive denial by Lithuania of any application for citizenship by Zadvydas.  Accordingly, it is premature to assume that the Lithuanians will reject Zadvydas based on the current documentation.  Even if they were to demand more reliable evidence of his father's birthplace, there is no basis on which to conclude that more cannot be uncovered.  After all, it does not seem disputed that he was born in what became Lithuania.  For example, a search of the public records in Mazeikiai or elsewhere (so far apparently unperformed anywhere by anyone) might prove fruitful.  To be sure, such efforts may ultimately prove unsuccessful.  And even if unimpeachable evidence of Lithuanian parentage is produced, there is a hint in the record that Lithuania might be able to reject Zadvydas' application based on his criminal record.  However, there is no basis for finding that any ability of Zadvydas to become a Lithuanian citizen, and hence deportable there, has been definitively foreclosed.

Also, apart from Lithuania, two other potential options appear to remain unexplored.  The record indicates that the German government, in a letter dated May 1995, has definitively rejected the INS' efforts to deport Zadvydas to Germany and mentioned "extensive research" establishing that he is not a German citizen.

24

If—as it appears—the only evidence put forth by the INS was Zadvydas' birth in Germany, this decision would seem justified under the *jus sanguinis* principle. However, it would seem that another argument, as yet apparently untapped, might properly be advanced to justify Zadvydas' German citizenship. Zadvydas may in fact have German blood, and thus qualify under *jus sanguinis*.

After World War Two, German law allowed members of ethnic German communities—some of which, such as the "Volga Germans," had been separated from Germany proper for centuries—to claim citizenship under far more lenient terms than applied to foreigners generally. *See* Note, *Deutschland ist Doch ein Einwanderungsland Geworden: Proposals to Address Germany's Status as a "Land of Immigration,"* 30 Vand. J. Transnat'l L. 905, 916-923 (1997). Zadvydas' mother was born in the Memel region in 1919. Prior to its defeat in World War One, this region was part of Germany. It would thus seem reasonably possible that Zadvydas' mother could be considered an ethnic German—indeed, her birth documentation is in German, not Lithuanian or Polish. It lists her maiden name as Steffan, and her mother's maiden name as Jackshies. It is not obvious to us that these are non-Germanic names. Perhaps Zadvydas could apply for German citizenship claiming ethnic German ancestry.[15] Obviously, the success of such an approach is far from assured—and even if Zadvydas' ethnic status can be shown, his

---

[15] There is nothing to indicate that the mother's potential German ethnicity would in any way affect parallel efforts to obtain Lithuanian citizenship. Lithuania's laws appear to be solely focused on the problem of Russian immigrants.

presence in the United States, lack of language skills, or what seems to be his father's likely un-Teutonic ethnicity might defeat such an application. *But see id.* at 923 ("Judicial interpretation and administrative application of the statutes governing naturalization of ethnic Germans have established that the threshold for proving oneself to be an ethnic German is very low.").

A final potential option, apparently completely unexplored, is to attempt to claim Russian citizenship for Zadvydas. Wherever Zadvydas' parents were born, it seems undisputed that their birthplaces would have been inside the borders of the Soviet Union at its post-war height. Russia has apparently been liberal in granting citizenship to former citizens of the Soviet Union now living outside of Russia's borders. See Kalvaitis, *National Identity in the Baltic States*, 16 Bos. U. Int'l L. J. at 240 n.64. It is noted in an INS affidavit that Zadvydas' mother travels to Russia frequently. Before the immigration judge Zadvydas seemed to indicate that these visits were to visit family.[16] An INS letter indicates the Zadvydas's mother has a sister in Russia whom she visits every year. If Zadvydas does indeed have an aunt living in Russia, he might perhaps qualify for citizenship there. The record does not reveal the details of this apparent family relationship, nor does it contain a discussion of Russian citizenship law. Again, then, success obviously cannot be presumed. The point is

---

[16] When the immigration judge asked whether Zadvydas was aware of any relatives he might have in Germany on his mother's side who she was in contact with, Zadvydas replied "no, she goes to Russia."

26

that the record indicates that there may be some slight possibility of this, and that this possibility is apparently wholly unexplored.

As the preceding discussion indicates, the unfortunate historical context of Zadvydas' birth makes untangling his true nationality highly difficult and time consuming at best. But that does not mean impossible. Continued efforts might eventually produce a breakthrough with Lithuania—and, if required, further proof of his father's birth may ultimately be unearthed. And avenues for claiming German and Russian citizenship remain unexplored. Nor is it clear that the Dominican situation has been fully explored. While the delay here is long, it appears to be what one could expect given the tangled circumstances and inadequate documentation. Given the traditional deference we show to the other branches in matters of immigration policy, judicial intrusion should not be considered, particularly where there are reasonable avenues for parole, until there is a more definitive showing that deportation is impossible, not merely problematical, difficult, and distant. However, it is certainly no clearer here that Zadvydas "will never be deported because there is no place to send him" than it was respecting the aliens in *Gisbert*, and here, as also in *Gisbert*, 988 F.2d at 1447, the government is continuing its efforts to effect Zadvydas' removal.

IV. Substantive Due Process and Detention of a Resident Alien Validly Ordered Deported

Zadvydas argues that as a resident alien he has greater rights under these circumstances than an excludable alien would, and thus that his current detention is a form of punishment unjustified by

27

any criminal conviction despite the result in cases such as *Mezei* and *Gisbert* involving excludable aliens. However, there is little, if any, room for a distinction between the rights in this respect of excludable and resident aliens when their circumstances are so similar. Zadvydas' detention is currently within the core area of the government's plenary immigration power and thus does not violate substantive due process.

The differences that exist in the rights of excludable and resident aliens are not the product of some bright line division that places excludable aliens beyond the pale of constitutional scrutiny. Excludable aliens are persons, entitled to some due process, and other, constitutional protections. The fact that they are entitled to a lesser degree of procedural due process in proceedings to determine whether they may enter the country stems ultimately not from their status as such, but rather from the nature of what is asserted. An attempt to enter this country is a request for a privilege rather than an assertion of right. *See Landon v. Plasencia*, 103 S.Ct. 321, 329 (1982). Denial of entry is thus not a deprivation of rights subject to procedural due process, and that, coupled with our deference to the other branches, mandates that we leave it to Congress to determine the procedures to be used in adjudicating such claims. *See, e.g., Knauff*, 70 S.Ct. at 313 ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned."). In practice, this determination may foreclose most constitutional challenges on behalf of excludable aliens and create the impression

28

that they have no constitutional rights. They have no procedural rights with regard to their entry, and most of their substantive rights will be constrained by the government's need to control immigration. *See, e.g., Gisbert*, 988 F.2d at 1448. Since many will never enter the country or will do so only briefly, they will have little opportunity to assert *Yick Wo*-type rights in matters unconnected to the plenary power. However, to the extent that their substantive rights are infringed—either during the immigration process or while they are on parole subject to the entry fiction—in a manner that cannot be connected to the immigration power, they may assert such rights. *See Lynch*, 810 F.2d at 1374-75 ( excludable aliens are persons, and thus allowed to bring suit against allegedly brutal government agents since "we cannot conceive of any national interests that would justify the malicious infliction of cruel treatment").

Resident aliens, by virtue of their presence here, develop an interest in remaining that, to a certain extent, entitles them to procedural due process before they may be removed from this country. *See, e.g., Landon*, 103 S.Ct. at 329 (in a discussion limited to procedural due process rights, noting "once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly. Our cases have frequently suggested that a continuously present resident alien is entitled to a fair hearing when threatened with deportation [citations], and, . . . we developed the rule that a continuously present permanent resident

29

alien has a right to due process in such a situation.").[17]

However, the fact that resident alien status entitles one to due process respecting the decision to deport does not mean that the plenary power concept is extinguished. On the contrary, the needs of the government are taken into account in evaluating such claims and the standard for evaluating procedures is thus lower than would be expected in analyzing the rights of a citizen with a like interest. *See Landon*, 103 S.Ct. at 330 (resident alien who has not severed her ties to the country is entitled to due process before being removed, but in evaluating procedures "it must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative"); *Galvan v. Press*, 74 S.Ct. 737, 742 (1954) (noting that while deportation of a long term resident alien is drastic measure with consequences analogous to those stemming from a criminal conviction, plenary power precedent mandates nonapplicability of the *ex post facto* clause); *I.N.S. v. Lopez-Mendoza*, 104 S.Ct. 3479, 3483 (1984) (deportation, despite the weighty interests involved, is a civil proceeding and not subject to the same battery of procedural protections as would govern a criminal trial); *United States ex rel. Bilokumsky v. Tod*, 44 S.Ct. 54, 56 (1923) (involuntary confession admissible in deportation hearing).

Nothing in these cases suggests that a resident alien has a

---

[17]    Indeed, as *Landon* reflects, those rights extend to resident aliens seeking *reentry* after a brief trip abroad not meaningfully interruptive of the alien's continued United States residence. *Id*. 103 S.Ct. at 329-330.

broadly privileged constitutional status relative to excludable aliens, or is constitutionally entitled to more favorable treatment when both the right asserted and the governmental interest are identical to those in the parallel case of an excludable alien.[18] The constitutional rights of resident aliens may certainly be affected by the plenary power. *See, e.g., Fong Yue Ting*, 13 S.Ct. at 1026 (in case involving rights of a resident alien, distinguishing *Yick Wo* on the grounds that "[t]he question there was of the power of a state over aliens continuing to reside within its jurisdiction, not of the power of the United States to put an end to their residence in the country"); *Wong Wing*, 16 S.Ct. at 981 (drawing distinction between "the power of congress to protect, by summary methods, the country from the advent of aliens . . . or to expel such if they have already found their way into our land, and unlawfully remain therein" and the decision to imprison aliens at hard labor for a term notwithstanding the ability to rapidly remove the alien from the national community). Both excludable and resident aliens have the right to be free of abuses that—while tangentially and remotely related to the immigration process—cannot be justified as in furtherance of immigration goals. *See Lynch*, 810 F.2d at 1375 (excludables); *Wong Wing*, 16 S.Ct. at 981

---

[18] In *Landon*, the court noted that a resident alien had greater substantive rights under the immigration *statutes*. *See Landon*, 103 S.Ct. at 326. In *Gisbert*, we referenced this discussion of statutory treatment and concluded that resident aliens "generally are granted greater substantive rights than are excludable aliens." *Gisbert*, 988 F.2d at 1440. Nothing in this discussion can be read to imply that there is an across-the-board difference in the constitutional (as opposed to statutory or regulatory) status of the two categories of aliens.

(resident). But both excludable and resident aliens may come in conflict with the government's sovereignty interests, and when this occurs their rights are constrained accordingly and to the same extent. As applied to detention pending removal, any here relevant constitutional distinction between excludable and resident aliens who have each been properly and finally determined to be removable would necessarily rest on a conclusion that excludable aliens are nonpersons wholly unprotected by the Constitution. However, that conclusion would conflict with our holding in *Lynch* and would require us to conclude that aliens in the position of those in *Gisbert* could be statutorily subjected to the rack and the screw, the Eighth Amendment notwithstanding.

In the circumstances presented here, the national interest in effectuating deportation is identical regardless of whether the alien was once resident or excludable. When a former resident alien is—with the adequate and unchallenged procedural due process to which his assertion of a right to remain in this country entitles him—finally ordered deported, the decision has irrevocably been made to expel him from the national community. Nothing remains but to effectuate this decision. The need to expel such an alien is identical, from a national sovereignty perspective, to the need to remove an excludable alien who has been finally and properly ordered returned to his country of origin. *See Fong Yue Ting*, 13 S.Ct. at 1022 (the "power to exclude aliens, and the power to expel them, rest upon one foundation, are derived from one source, are supported by the same reasons, and are in truth but

32

parts of one and the same power"). Whether the party to be deported is an excludable or a former resident, the United States has properly made its decision and earnestly wishes—if for no other reason than to save the cost of detention—to deport the detainee. And deportation itself is not punishment. *See INS v. Lopez-Mendoza*, 104 S.Ct. at 3483 ("The purpose of deportation is not to punish past transgressions, but rather to put an end to a continuing violation of the immigration laws."); *American-Arab,* 119 S.Ct. at 947 ("Even when deportation is sought because of some act the alien has committed, in principle the alien is not being punished for that act (criminal charges may be available for that separate purpose) but is merely being held to the terms under which he was admitted. And in all cases, deportation is necessary in order to bring to an end *an ongoing violation* of United States law.").

The fact that deportation cannot be immediately effectuated would not seem to recreate a distinction in the government's interest regarding excludable aliens and resident aliens. When deportation is somehow blocked, the government must worry about two things. If the alien is not detained, he may commit crimes against the general population—crimes he would have been unable to commit had the decision to deport been effectuated. The whole *point* of earmarking criminal aliens for deportation or exclusion is that while we must tolerate a certain risk of recidivism from our criminal citizens, we need not be similarly generous when it comes to those who have not achieved citizenship. Their presence in this

33

country is thus a continuing violation of the immigration laws, and if the preferred method of ending this violation is unavailable, detention may be an acceptable alternative mechanism to achieve the ultimate goal. *See Gisbert*, 988 F.2d at 1442 (noting protection of society from potentially dangerous alien was a rational, nonpunitive purpose for detention). *See also Tran v. Caplinger*, 847 F.Supp. 469, 476 (W.D. La. 1993) ("This court can find no logical basis to conclude that the detention of a deportable alien under these circumstances is 'punishment' while the detention of an excludable alien is not").[19] In addition, when deportation becomes feasible, the alien may frustrate the process by disappearing within the country, as so many have done. If the government's efforts eventually make deportation feasible, it will be unable to effectuate its decision to expel if the alien has fled and gone

---

[19]     Pre-trial detention of citizens charged with a serious crime—but presumptively innocent—may be justified by the government's interest in protecting the public. *See United States v. Salerno*, 107 S.Ct. 2095, 2103 (1987). The Court has allowed indefinite detention of a citizen as long as there has been a finding of continued danger and "some additional factor" is present. *See Kansas v. Hendricks*, 117 S.Ct. 2072, 2080 (1997). In *Hendricks*, the special circumstance or additional factor was a diagnosis of pedophilia, and the Court upheld a statute that allowed indefinite detention of such persons as long as periodic review was available to certify that the detainee remained dangerous and mentally ill. *Cf. Foucha v. Louisiana*, 112 S.Ct. 1780, 1788 (1992) (indefinite detention of person acquitted by reason of insanity after medical diagnosis indicated he was no longer mentally ill could not be justified by danger alone). *See also Gisbert*, 988 F.2d at 1441 n.6 (distinguishing *Foucha* on the grounds it involved a citizen and a case where "the basis for holding him in that facility had ceased to exist"). We note this only to demonstrate that detention of certain classes of persons to protect society at large is not wholly alien to our constitutional order and has been allowed in special situations when, as here, there are procedures to insure that detention must be periodically reviewed.

34

underground in the interim. These interests are both equally potentially present regardless of whether an alien was once resident or excludable.

Once the decision is made to deport a resident alien, then, there is little, if any, difference in the government's interest in effectuating deportation of a resident alien and expulsion of an excludable alien. There is thus nothing to adequately distinguish the plenary interest from the one encountered in *Gisbert*. To the extent that Zadvydas had greater rights than the excludable aliens there, such rights were, so far as here relevant, procedural rights respecting the deportation decision, and have concededly been honored. We hold that the government may detain a resident alien based on either danger to the community or risk of flight while good faith efforts to effectuate the alien's deportation continue and reasonable parole and periodic review procedures are in place.[20]

## Conclusion

For the reasons stated, the judgment of the district court is

REVERSED.

---

[20] We are aware of the recent joint opinion of five district judges in the Western District of Washington in *Binh Phan et al. v. Reno et al.* (Nos. C98-2342, C99-177C, C99-185R, C99-341WD, & C99-151L, W.D. Wash. July 9, 1999), which reaches a contrary result. We decline to follow that decision because it rests on a categorical distinction between the detention pending expulsion of deportable aliens who have been finally and properly ordered deported and the detention pending expulsion of excludable aliens who have been finally and properly ordered removed, a distinction which for these purposes we have rejected for the reasons stated in the text.

35