IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 99-60715

---

VICTOR RODRIGUEZ-SILVA,

                                        Petitioner,

        versus

IMMIGRATION AND NATURALIZATION SERVICE,

                                        Respondent.

---

Petition for Review of an Order of the
Immigration and Naturalization Service

---

February 8, 2001

Before GARWOOD, HIGGINBOTHAM, and STEWART, Circuit Judges.

GARWOOD, Circuit Judge:

        Petitioner Victor Rodriguez-Silva, a native and citizen of
Mexico, seeks review of the decision of the Board of Immigration
Appeals denying the suspension of his deportation from the United
States.    Rodriguez-Silva argues that the provisions of the
Nicaraguan Adjustment and Central American Relief Act, Pub. L. 105-
100, Title II, 111 Stat. 2160, 2193 (Nov. 19, 1997), which exempt
aliens of specified nationalities, but not including (among others)
Mexican nationals, from the "stop-time" rule of the Illegal
Immigration Reform and Immigrant Responsibility Act, Pub. L. No.

104-208, 110 Stat. 3009 (Sept. 30, 1996), deny him equal protection of the laws under the Fifth Amendment.  We disagree, and hence deny the petition for review.

## Facts and Proceedings Below

Although it presents but a single issue, this case has a long and convoluted procedural history.

On September 2, 1993, the Immigration and Naturalization Service (INS) served the petitioner, Victor Rodriguez-Silva, with an Order to Show Cause and Notice of Hearing (OSC), charging that he was deportable because he entered the country without inspection in February of 1987.[1]  Rodriguez-Silva, a native and citizen of Mexico (who has never been lawfully admitted to the United States), was also notified on September 30, 1993, that he faced an additional charge of civil document fraud.  An immigration judge (IJ) conducted a hearing, at which Rodriguez-Silva conceded that he was deportable, but denied having committed document fraud.  The IJ ultimately found the document fraud charge to be valid, and ordered Rodriguez-Silva to be deported to Mexico, denying his motion for voluntary departure.

Rodriguez-Silva appealed the IJ's denial of voluntary departure, but did not appeal the order of deportation.  On February 22, 1994, the Board of Immigration Appeals (BIA) upheld

---

[1] Rodriguez-Silva was charged with violating former § 241 (a)(1)(B) of the Immigration and Naturalization Act of 1952 (INA), 8 U.S.C. § 1251(a)(1)(B) (1999).

the IJ's denial of voluntary departure, prompting Rodriguez-Silva to file a petition for review of the BIA decision with this Court. However, before the Court ruled on the petition, the INS rescinded its finding of document fraud, and we thus remanded the case to the BIA. The BIA thereafter granted Rodriguez-Silva's unopposed motion to reopen the case.

At the reopened hearing on May 20, 1996, Rodriguez-Silva presented his application for suspension of deportation to the IJ. The IJ found that Rodriguez-Silva was a person of good moral character and that he had established seven years of residence in the United States. However, she denied his application for suspension of deportation because she found that he had failed to establish extreme hardship. She then authorized Rodriguez-Silva to depart the United States voluntarily within ninety days. Rodriguez-Silva appealed the IJ's decision to the BIA.

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996). Under the law as amended by IIRIRA, aliens who "ha[ve] resided in the United States continuously for 7 years after having been admitted in any status" are eligible for cancellation of their removal from the United States. 8 U.S.C. § 1229b(a)(2). This provision in general makes aliens who have entered the country illegally eligible to stop standard deportation proceedings if they have resided in the United States continuously

3

for seven years. IIRIRA instituted the "stop-time" rule, which was intended to prevent aliens in deportation proceedings from delaying those proceedings in order to accrue enough time in continuous residence to be eligible for cancellation of their deportation. Under the stop-time rule, an alien's period of continuous physical presence in the United States is deemed to end once he is served with a notice to appear for removal proceedings, or commits any of a category of criminal offenses. *See* 8 U.S.C. § 1229b(d)(1).

In 1997, the BIA held that the IIRIRA stop-time rule extended to aliens who had applied for suspension of deportation prior to IIRIRA's enactment. *See In re* N-J-B, Int. Dec. 330, 1997 WL 107593 (BIA Feb. 20, 1997). On the basis of IIRIRA section 309(c)(5), which outlines the Act's transitional regime regarding suspension of deportation, the BIA concluded that the stop-time rule applied to aliens in deportation proceedings before September 30, 1996-the date of IIRIRA's enactment.

On April 4, 1997, the BIA dismissed Rodriguez-Silva's subsequent appeal of the IJ's 1996 decision. It held that Rodriguez-Silva's case fell under the IIRIRA transitional rules because his deportation proceedings had begun before September of 1996. Citing *In re N-J-B*, the BIA reasoned that Rodriguez-Silva was statutorily ineligible for suspension of deportation because the 1993 OSC was served before he had accrued seven years of continuous physical residence in the United States.

4

Rodriguez-Silva then filed a petition for review of the BIA decision with this Court. While the petition was still pending, the Attorney General vacated *In re N-J-B*,[2] and this Court granted Rodriguez-Silva's motion to again remand the case to the BIA on September 25, 1997.

On November 19, 1997, while Rodriguez-Silva's remanded case was pending before the BIA, Congress enacted the Nicaraguan Adjustment and Central American Relief Act (NACARA).[3] The NACARA effectively codified the *In re N-J-B* decision by making it clear that the stop-time rule applied to orders to show cause issued on, before, or after the date of IIRIRA's enactment.[4] NACARA section 203 also amended the transition rules set forth in IIRIRA section 309(c)(5) to relax the eligibility requirements (including the stop-time rule) for suspension of deportation for certain specified nationalities—but not including (among others) Mexican nationals, such as Rodriguez-Silva—who were in deportation or exclusion proceedings before IIRIRA's effective date of April 1, 1997.[5] In

---

[2] *See* Att'y Gen. Order No. 2093-97 (July 10, 1997).

[3] District of Columbia Appropriations Act of 1998, tit. II, Pub. L. No. 105-100, 111 Stat. 2160, 2193 *as amended*, Pub. L. No. 105-139, 111 Stat. 2644 (Dec. 2, 1997).

[4] *See* NACARA § 203(a)(1), Pub. L. No. 105-100, 111 Stat. 2160, 2193.

[5] The nationalities exempted from IIRIRA's requirements are Salvadorans, Guatemalans, and nationals of the Soviet Union (or its successor republics), Latvia, Estonia, Lithuania, Poland, Czechoslovakia, Romania, Hungary, Bulgaria, Albania, East Germany,

5

April 1999, the BIA held that the NACARA amendment to the IIRIRA stop-time rule provision was "unambiguous," and that the IIRIRA physical presence requirements therefore applied to cases pending on the date of IIRIRA's enactment.[6]  On the basis of that decision, the BIA, in September 1999, held that Rodriguez-Silva could not be considered for suspension of deportation because he was unable to demonstrate seven years of physical presence in the United States before he was served with the 1993 OSC. The BIA dismissed Rodriguez-Silva's appeal, authorizing him to depart the United States voluntarily.

Rodriguez-Silva now seeks review by this Court of the BIA's September 1999 decision.  His sole claim on appeal is that the provisions of the NACARA that exempt aliens of specified nationalities—but not including his nationality—from the stop-time provisions of the IIRIRA violates his right to equal protection of the laws under the Fifth Amendment to the United States Constitution.  Rodriguez-Silva argues that he should be afforded the right to present his suspension of deportation application to an immigration judge just as the class of aliens described in the NACARA have been allowed to do.

---

or Yugoslavia (or its successor republics).  *See* NACARA § 203(a)(1), *codified as amended at* 8 U.S.C. 1101 note (1999).

[6] *See In re* Nolasco-Tofino, Int. Dec. 3385 (BIA 1999).

## Discussion

Because Rodriguez-Silva challenges a BIA decision issued on or after October 31, 1996, in a deportation case initiated prior to April 1, 1997, this Court has jurisdiction pursuant to the transition rules for judicial review set forth in section 309(c)(4) of the IIRIRA, Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996), and those provisions of section 106 of the INA which those transition rules do not supercede. *See Moosa v. INS*, 171 F.3d 994, 1010 (5th Cir. 1999); *Kalaw v. INS*, 133 F.3d 1147, 1152 (9th Cir. 1997); *see also* IIRIRA §§ 309(a) (setting April 1, 1997, as the general effective date for many IIRIRA provisions) and 309(c)(4) (establishing transitional rules for judicial review of final orders of exclusion and deportation issued on or after October 31, 1996). We turn now to the merits of Rodriguez-Silva's claim.

The petitioner does not contend that the stop-time rule itself suffers from any infirmity. Instead, he argues that the NACARA provisions that apply the rule selectively to certain nationalities, but not his, violate his right to equal protection of the laws. Rodriguez-Silva admits that congressional acts regulating immigration are due substantial deference, but argues that even under rational basis scrutiny the NACARA classifications are invalid. Before we reach the rationality of the NACARA, we must first determine if the Fifth Amendment requires that Congress justify nationality-sensitive admission criteria for aliens.

Although resident aliens are entitled to many constitutional protections, *see Landon v. Plasencia*, 103 S.Ct. 321 (1982); *Hampton v. Mow Sun Wong* 96 S.Ct. 1895 (1976), this protection is limited by Congress's broad powers to control immigration. Indeed, the Supreme Court "has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 97 S.Ct. 1473, 1478 (1977) (quoting *Oceanic Navigation Co. v. Stranahan*, 29 S.Ct. 671, 676 (1909)). The Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute . . . largely immune from judicial control," *Shaughnessey v. Mezei*, 73 S.Ct. 625, 628 (1972), and has noted that "the power over aliens is of a political character and therefore subject only to narrow judicial review." *Mow Sun Wong*, 96 S.Ct. at 1904 n. 21. *See also Harisiades v. Shaughnessy*, 72 S.Ct. 512, 522 (1952) (Frankfurter, J., concurring) ("The conditions for entry of every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, the grounds on which such determination shall be based, have been recognized as matters solely for the responsibility of the Congress and wholly outside the power of this Court to control.")

However, the broad power to control immigration does not imbue Congress with plenary power over aliens themselves. As this Court

recently stated: "Aliens can of course claim some constitutional protections. The language of the due process clause refers to 'persons,' not 'citizens,' and it is well established that aliens within the territory of the United States may invoke its protections." *Zadvydas v. Underdown*, 185 F.3d 279, 289 (5th Cir. 1999), *cert. granted*, 121 S.Ct. 297 (2000). For example, an alien may not be punished criminally without the same process of law that would be due a citizen of the United States. *Wong Wing v. United States*, 16 S.Ct. 977, 981 (1896). In this Circuit it is also clear that aliens are "persons" entitled to protection against invidious State action under the Fourteenth Amendment. *See Zadvydas*, 185 F.3d at 289; *Lynch v. Cannatella*, 810 F.2d 1363, 1375 (5th Cir. 1987). Aliens enjoy some constitutional protections, regardless of their status. The question petitioner raises is whether the Fifth Amendment's Due Process Clause requires Congress to provide a rational basis for its decision when it sets exclusion criteria for aliens.

The Due Process Clause of the Fifth Amendment applies to the federal government a version of equal protection largely similar to that which governs the states under the Fourteenth Amendment. But, even though equal protection principles require the same type of analysis under the Fifth and Fourteenth Amendments, *see Buckley v. Valeo*, 424 U.S. 1, 93 (1976), the scope of the two protections is not necessarily identical. In *Hampton v. Mow Sun Wong*, 96 S.Ct.

9

1895 (1976), the Supreme Court held that civil service regulations requiring United States citizenship of all federal employees violated equal protection, but the Court also indicated that had the citizenship requirement been imposed by Congress or the President it would likely have been justified by overriding national concerns and would not have infringed on whatever due process rights the petitioners possessed. *Mow Sun Wong*, 96 S.Ct. at 1906. The Court pointed out that due process does not always require of the federal government what equal protection would of the states, and noted that the federal government can enact legislation that would be invalid under the Fourteenth Amendment if enacted by a State, particularly if the legislation related to immigration. *Id. at* 1903-06*.* The Supreme Court has also recognized that the governmental power to exclude or expel aliens may restrict aliens' constitutional rights when the two come into direct conflict. *See Mathews v. Diaz*, 96 S.Ct. 1883, 1891 (1976) ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens.").

Because of foreign policy considerations, the United States government has encouraged Nicaraguans and Cubans to remain in this country, and had also given special protections to other Central American and European groups. *See Appiah v. INS*, 202 F.3d 704, 710 (4th Cir. 2000) (quoting 143 Cong. Rec. S12,261 (daily ed. Nov. 9,

10

1997) (statement of Sen. Abraham)). The NACARA was intended by Congress to correct a provision in the IIRIRA that would have "chang[ed] the rules in the middle of the game for thousands of Central Americans and others who came to the United States because their lives and families had been torn apart by war and oppression." *Id.* The core of Congress's power over immigration is the ability to set the requirements an alien must meet to qualify for admission to, or continued residence in, the United States or for naturalization as a United States citizen. Due process does not require Congress to grant aliens from all nations the same chances for admission to or remaining within the United States. Congress may permissibly set immigration criteria that are sensitive to an alien's nationality or place of origin. It is not for this Court to question Congress's decisions on such matters.

Because we hold that the equal protection principles that are implicit in the Due Process Clause of the Fifth Amendment do not in any way restrict Congress's authority to set admission and naturalization criteria that are place of origin or nationality-sensitive, we do not reach the question of whether the NACARA satisfies rational basis review in this respect.[7]

---

[7] Although it is very likely that it would. *See Appiah*, 202 F.3d at 709-10 (holding that Congress had ample foreign policy reasons for enacting the NACARA, and that the Act does not violate equal protection).

11

## Conclusion

We hold that the equal protection principles that are implicit in the Due Process Clause of the Fifth Amendment do not in any way restrict Congress's power to use nationality or place of origin as criteria for the naturalization of aliens or for their admission to or exclusion or removal from the United States. The petitioner's claim rests entirely on the argument that equal protection requires Congress provide a rational basis for the nationality-sensitive provisions of the NACARA. Congress need not make such a showing; its regulatory power in this respect is plenary. Because we find no error in the decision of the BIA, the petition for review is

DENIED.