# In re Nai Meng SAELEE, Respondent

## File A25 318 889 - San Francisco

*Decided February 25, 2000*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) The Board of Immigration Appeals has jurisdiction over an appeal from a district director's custody determination that was made after the entry of a final order of deportation or removal pursuant to 8 C.F.R. § 236.1 (1999), regardless of whether the alien formally initiated the review.

(2) An alien subject to a final order of deportation based on a conviction for an aggravated felony, who is unable to be deported, may be eligible for release from detention after the expiration of the removal period pursuant to section 241(a)(6) of the Immigration and Nationality Act, 8 U.S.C. § 1231(a)(6) (Supp. II 1996).

(3) Where an alien seeking review of a district director's post-final-order custody determination failed to demonstrate by clear and convincing evidence that the release would not pose a danger to the community pursuant to 8 C.F.R. § 241.4(a) (1999), the district director's decision to continue detention was sustained.

Carolyn M. Wiggin, Esquire, San Francisco, California, for respondent

Theresa H. Bloomfield, Assistant District Counsel, for the Immigration and Naturalization Service

Before: Board En Banc: SCHMIDT, Chairman; DUNNE, Vice Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, VILLAGELIU, COLE, GUENDELSBERGER, MOSCATO, and MILLER, Board Members. Concurring Opinions: FILPPU, Board Member, joined by MATHON and JONES, Board Members; GRANT, Board Member; SCIALABBA, Vice Chairman. Concurring and Dissenting Opinion: ROSENBERG, Board Member.

SCHMIDT, Chairman:

The respondent is an alien subject to a final administrative deportation order. He has taken a timely appeal from the November 19, 1998, decision of a district director of the Immigration and Naturalization Service to continue his detention.

We find that we have jurisdiction over this appeal and that the respondent is eligible for release, but that the respondent has not satisfied the regulatory criteria for release. We will therefore dismiss the appeal.

## I. ISSUES

The issues in this case are: first, whether we are deprived of jurisdiction over this appeal because the district director, not the respondent, initiated the custody determination; second, whether this case is governed by the release criteria set forth in section 241(a)(6) of the Immigration and Nationality Act, 8 U.S.C. § 1231(a)(6) (Supp. II 1996); and third, whether the respondent meets the criteria for release under that section and the implementing regulations contained at 8 C.F.R. § 241.4(a) (1999).

For the reasons set forth below, we answer the first and third questions in the negative and the second question in the affirmative.

## II. RELEVANT CASE HISTORY

On December 28, 1992, the respondent was convicted of robbery and attempted robbery. He was sentenced to a term of imprisonment of 3 years and 8 months, with an additional term of 3 years as an enhancement for using a firearm in the commission of the offense.

The Service issued an Order to Show Cause and Notice of Hearing (Form I-221) on June 19, 1996, charging the respondent with deportability under section 241(a)(2)(A)(iii) of the Act, 8 U.S.C. § 1251(a)(2)(A)(iii) (1994), for having been convicted of an aggravated felony. The respondent was released from the California Department of Corrections and taken into custody by the Service in July 1996.

On November 15, 1996, the Immigration Judge ordered the respondent deported to Denmark with an alternative order of deportation to Laos. The respondent did not appeal that decision. Consequently, the order became administratively final.

The respondent remains in the custody of the Service, notwithstanding that it has been over 3 years since the issuance of the final deportation order. The respondent alleges that the Service has made no attempt to obtain the proper documents to execute the final order of deportation. However, it is not clear from the record before us whether the Service has attempted to execute the order.

The respondent filed a writ of habeas corpus in the United States District Court for the Eastern District of California prior to July 1998. On November 6, 1998, the Service interviewed the respondent. On November 19, 1998, the district director issued a decision to continue to detain him.

The respondent timely filed a Notice of Appeal on February 11, 1999, within 10 days of being sent a copy of the district director's decision. See 8 C.F.R. § 236.1(d)(3)(iii) (1999).

## III. JURISDICTION

### A. Arguments on Appeal

The Service argues that we do not have appellate jurisdiction because the district director's determination is not the type of custody determination contemplated within the regulations at 8 C.F.R. § 236.1. According to the Service, those regulations authorize us to review a district director's post-final-order custody determination only when the alien has initiated the custody review. The Service contends that the review of the respondent's custody status was conducted sua sponte and not as a result of any request he made.

The respondent argues that the regulations neither explicitly nor implicitly require that the alien initiate custody review in order to appeal the district director's decision. He also asserts that the absence of a formal request for the initial review of his custody status should not preclude him from appealing.

The respondent notes that the regulations provide no information explaining the steps an alien must take or the forms an alien should use to formally initiate a custody review process. He contends that this absence of a formal regulatory procedure indicates that the alien's initiation of custody review proceedings was not meant as a prerequisite to appeal. The respondent also asserts that the Service has a history of misinforming aliens of their right to request a custody determination and the proper procedures to follow to make such a request.

### B. Regulatory Scheme

The regulations pertaining to custody determinations for aliens are found at 8 C.F.R. § 236.1. Custody and bond determinations are made by the district director once an order becomes administratively final. 8 C.F.R. § 236.1(d)(1).

The regulation at 8 C.F.R. § 236.1(d)(3)(iii) states:

> The alien, within 10 days, may appeal from the district director's decision under paragraph (d)(2)(ii) of this section, except that no appeal shall be allowed when the Service notifies the alien that it is ready to execute an order of removal and takes the alien into custody for that purpose.

The regulation further provides as follows:

> After an order becomes administratively final, the respondent may request review by the district director of the conditions of his or her release.

8 C.F.R. § 236.1(d)(2)(ii).

The regulatory language does not support the Service's interpretation. There is no requirement that an alien initiate a custody request to obtain review of any custody determination. The regulatory history is also silent in this regard.

Overall, the regulatory scheme provides an alien who is detained after the issuance of a final order an opportunity to obtain appellate review of a district director's custody determination, unless the Service has determined that it is ready to execute the order. It is not apparent why this review opportunity should depend on who "instituted" the custody determination.

Moreover, in this case, the director made an individualized adjudication of this particular alien's suitability for release, using factors such as dangerousness and flight risk. These are the factors historically used by us and the Immigration Judges in bond adjudications. *See Matter of Noble*, 21 I&N Dec. 672 (BIA 1997); *Matter of Drysdale,* 20 I&N Dec. 815 (BIA 1994). We find that when an adjudication of this character is made, it does not matter whether it was requested by the alien.

Accordingly, we conclude that we have jurisdiction over this appeal.

## IV. RESPONDENT'S ELIGIBILITY FOR RELEASE

The Service and respondent's counsel agree that aliens, such as the respondent, who have been detained pursuant to a final orders of deportation entered before the April 1, 1997, effective date of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA"), may be released from custody if they satisfy the criteria set forth in section 241(a)(6) of the Act. This position is consistent with the two circuit court decisions that have addressed this or similar situations. *Chi Thon Ngo v. INS*, 192 F.3d 390 (3d Cir. 1999); *Zadvydas v. Underdown*, 185 F.3d 279, 297 (5th Cir. 1999). We will accept the parties' agreed-upon position in this regard.

We agree with the court in *Chi Thon Ngo v. INS, supra*, at 395 n.5, that extended discussion "on the possible application of the various versions of the statutes without a necessity to do so can create troubling precedents or dicta."

Having determined that the respondent is eligible for release from custody, we proceed to the issue of whether he meets the criteria for release.

## V. CRITERIA FOR RELEASE

### A. Applicable Regulatory Criteria

The criteria for release under section 241(a)(6) of the Act are set forth at 8 C.F.R. § 241.4(a). To be released, an alien must demonstrate "by clear and convincing evidence that the release would not pose a danger to the community or a significant flight risk." The regulation sets forth a nonexclusive list of nine factors that may be considered in determining release.

The Service does not assert that the respondent is a flight risk. The only question is whether he continues to be a danger to the community.

### B. De Novo Review

On November 19, 1998, following a personal interview, the director determined that the respondent should be continued in detention because he is a danger to the community. The district director's decision is not sufficiently analytical. It does not show that the significant favorable factors in the respondent's case were carefully considered and weighed against the significant adverse factors. *See, e.g., Matter of A-P-,* 22 I&N Dec. 468 (BIA 1999) (stating that an initial adjudication shall adequately explain and link the facts and the law); *Matter of M-P-,* 20 I&N Dec. 786 (BIA 1994) (holding that the reasons for a decision must be identified and explained). Therefore, a de novo appellate review is required. *See, e.g., Matter of Rodriguez-Carrillo,* 22 I&N Dec. 1031 (BIA 1999) (providing that de novo review is appropriate where the record is complete but the decision below is inadequate).

### C. Favorable Factors

The respondent has set forth the following favorable factors: 1) his early release from prison due to credit for good behavior; 2) a determination by an Immigration Judge at the time of his deportation proceeding that he could be released on $5,000 bond; 3) the lack of any serious disciplinary write-ups while in Service and state custody; 4) completion of automotive training courses at the Yuba County Jail, with a favorable recommendation from the instructor; 5) trustee status at the Yuba County jail for over a year; 6) parents and siblings who reside legally in the United States; 7) food service training and experience; 8) church membership; 9) GED course work; and 10) passage of time since his last offense in 1992.

### D. Adverse Factors

The respondent's adverse factors are: 1) 1992 convictions for violent

crimes of robbery and attempted robbery; 2) a 3-year sentence enhancement for use of a firearm; 3) limited expressions of remorse; 4) callous treatment of victims, showing little regard for human life or dignity; 5) involvement in other criminal activities, such as automobile theft; 6) juvenile offenses of a violent nature including assault and battery and assault with a firearm; and 7) limited acceptance of responsibility for his antisocial behavior.

**E. Analysis**

Overall, the respondent has shown some efforts at self-improvement while in prison and has demonstrated some potential for employment and integration into the community if released. On the other hand, he has proven violent tendencies and has not clearly demonstrated remorse or understanding of the seriousness of his violent behavior. In particular, he has shown little acceptance or appreciation of the potential life-changing mental anguish that he inflicted on one of his victims by tying him up and terrorizing him at gun point.

Although the respondent has shown some progress to date, we find that he has failed to present "clear and convincing" evidence that he would not pose a danger to the community. Therefore, we sustain the district director's decision to continue detention, subject to periodic rereview.

## VI. CONCLUSION

Contrary to the Service's argument, we have jurisdiction to consider this appeal. We agree with the parties that we can consider this deportable respondent's post-final-order release from custody. Under the applicable regulation, the respondent has failed to demonstrate by clear and convincing evidence that he would not pose a danger to the community. *See* 8 C.F.R. § 241.4(a). Therefore, the respondent should be continued in Service custody pending periodic rereview of his situation. Accordingly, his appeal will be dismissed.

**ORDER:** The appeal is dismissed.

*CONCURRING OPINION:* Lauri Steven Filppu, Board Member, in which Lauren R. Mathon and Philemina M. Jones, Board Members, joined

I respectfully concur in the result reached by the majority. I agree that we have jurisdiction over this appeal for the reasons set forth by the majority. I also agree that the appeal should be dismissed, but I do so because I do not understand the governing statute to allow us to order the respondent's release under any set of circumstances.

## I. THE MAJORITY'S STATUTORY RULING

The respondent has been detained by the Immigration and Naturalization Service pursuant to a final order of deportation that was entered over 3 years ago, in November of 1996. The Service has not actually deported the respondent since the entry of that order, and the respondent now argues that he should be released back into the community. Because of changes in the law that took place in 1996, and the fact that the respondent is under an order of "deportation" and not an order of "removal," we requested that the parties brief the question of which statute governs our review of this "post-final-order" custody case.

Notwithstanding that special briefing, the majority specifically declines to discuss the relevant statutory provisions, claiming that to do so might "'create troubling precedents or dicta.'" *Matter of Saelee*, 22 I&N Dec. 1258, at 1261 (quoting *Chi Thon Ngo v. INS,* 192 F.3d 390, 395 n.5 (3d Cir. 1999)). Curiously, though, it also claims to have "determined that the respondent is eligible for release from custody," rather than merely assuming so for purposes of this appeal. *Id.* In this respect, the majority accepts the parties' contentions that the applicable law is section 241(a)(6) of the Immigration and Nationality Act, 8 U.S.C. § 1231(a)(6) (Supp. II 1996), which was enacted by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA").

A straightforward reading of the general transition rules of the IIRIRA, however, directs the application of earlier "deportation" law in this case. Section 309(c)(1) of the IIRIRA, 110 Stat. at 3009-625, as amended by Pub. L. No. 104-302, 110 Stat. 3656, 3657 (Oct. 11, 1996), provides that many of the IIRIRA's amendments, including section 241(a)(6) of the Act pertaining to detention after the issuance of a final order of removal, "shall not apply" to "an alien who is in exclusion or deportation proceedings before the title III-A effective date" of April 1, 1997. The respondent here was in deportation proceedings before an Immigration Judge both before and after the September 30, 1996, date of enactment of the IIRIRA. In fact, his final hearing took place on November 15, 1996, a month and a half after the IIRIRA's enactment, but well before the Title III-A effective date. At the time of his deportation hearing, there is no doubt that the respondent was "an alien who is in . . . deportation proceedings before the title III-A effective date." IIRIRA § 309(c)(1).

The majority fails to address the command of the statute. Moreover, its reliance on the parties' position as a substitute for statutory analysis is particularly ill-founded in this instance. As will be explained later, the Service's position mistakenly hinges on original statutory language in the general transitional rules of the IIRIRA, which was modified within days of the IIRIRA's enactment. The actual, modified general transitional rule

directs a conclusion contrary to that advanced by the Service.

The respondent's position is also founded in part on a misreading of the general transitional rules. But it is primarily based on the fact that the separate Transition Period Custody Rules in section 303(b)(3) of the IIRIRA, 110 Stat. at 3009-586, suspended some of the permanent detention provisions for a 2-year period, while not suspending the permanent law applicable to aliens with administratively final orders of removal. The respondent's argument raises some interesting questions about the law that may have governed during the life of the Transition Period Custody Rules. But those rules expired over a year ago. *See Matter of Adeniji*, 22 I&N Dec. 1102 (BIA 1999). The permanent provisions once again govern, and the respondent fails to offer a cogent theory on how the *general* transitional rules can be read such that current section 241(a)(6) of the Act actually controls here.

In sum, the majority chooses not to address the contrary literal language of the statute and simply adopts the position jointly advanced by the parties. The parties' arguments, however, are seriously flawed and do not support their positions. If there is a sound rationale for applying current section 241(a)(6) to this respondent, it is not found in the majority's opinion or the briefs filed by the parties. The majority's disquieting explanation appears to be that it simply does not want to set forth a rationale, because attempting to do so would create a troubling precedent.

## II. THE GENERAL TRANSITIONAL RULES

The IIRIRA was enacted on September 30, 1996, and many of its provisions took effect immediately. But a number of important changes carried a delayed effective date. Significantly, the amendments made by Title III-A of the IIRIRA were, in general, to take effect 6 months after enactment, specifically, on April 1, 1997. *See* IIRIRA § 309(a), 110 Stat. at 3009-625. The amendments made by Title III-A pertained mainly to the process of determining whether an alien should be removed from the United States. Among other things, these Title III-A amendments included changes to the character of the proceedings brought against aliens, to the rules governing detention during the hearing process, to the forms of relief available to removable aliens, to the provisions for obtaining judicial review, and to the law governing actual removal and detention after the entry of a final order of removal. *See* IIRIRA § 309(a).

Congress understood, however, that there were thousands of aliens already in proceedings under the law that existed prior to enactment of the IIRIRA. Some already had final orders of deportation or exclusion and were awaiting actual physical deportation from the United States. Others were in some earlier stage of proceedings under that prior law. And with a 6-month delayed effective date to Title III-A, still others would be put into proceed-

ings under prior law during that 6-month period.

The statute, in its general transitional rules, addressed the problems associated with switching from one system to another. With certain exceptions, the overall direction contained in the statute is to apply prior law to those persons whose proceedings took place or began under prior law. The new law was only to apply to those persons who were specially converted into the new system or whose cases began after the new provisions took effect on April 1, 1997.

The general transitional rules are contained in section 309(c) of the IIRIRA. As originally enacted, section 309(c)(1) provided:

> GENERAL RULE THAT NEW RULES DO NOT APPLY.—Subject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion or deportation proceedings *as of* the title III-A effective date—
> (A) the amendments made by this subtitle shall not apply, and
> (B) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments. (Emphasis added.)

The respondent here was under a final order of deportation as of November 15, 1996. The Service argues that he was therefore not in deportation proceedings "as of" the April 1, 1997, effective date of Title III-A. Consequently, the Service contends that it is the new law, not the prior law, that governs his post-final-order custody. Part of that new law, contained within the Title III-A amendments, is new section 241(a)(6) of the Act, which the parties and the majority say governs here. While the respondent's principal focus is not on the *general* transitional rules, he too appears to rely on the original version of section 309(c)(1), which contains the "as of" language highlighted above.[1]

Unfortunately, neither party's brief reflects an awareness that Congress amended the relevant language of section 309(c)(1). Only days after enacting the IIRIRA, Congress passed technical amendments to the IIRIRA in Pub. L. No. 104-302, § 2, 110 Stat. 3656, 3657 (enacted Oct. 11, 1996), which was legislation more generally aimed at extending the stay for certain nonimmigrant nurses ("Nurses Act"). Among these technical amendments, made "[e]ffective on September 30, 1996," was the substitution of the word "before" in place of the phrase "as of" in section 309(c)(1). The revised general transitional rule thus provides:

---

[1]In footnote 3 of his supplemental brief, the respondent states:

It should also be noted that IIRIRA § 309(c) provides that aliens "in exclusion or deportation proceedings" *as of* April 1, 1997, would not be subject to IIRIRA. Because Mr. Saelee was subject to a final deportation order by April 1, 1997, it would seem that he was not "in deportation proceedings" *as of* April 1, 1997, and thus IIRIRA applies to him. (Emphasis added.)

> GENERAL RULE THAT NEW RULES DO NOT APPLY.—Subject to the suc-
> ceeding provisions of this subsection, in the case of an alien who is in exclusion or
> deportation proceedings *before* the title III-A effective date—
>     (A) the amendments made by this subtitle shall not apply, and
>     (B) the proceedings (including judicial review thereof) shall continue to be conduct-
> ed without regard to such amendments.  (Emphasis added.)

The respondent's final deportation hearing took place during the 6-month period between the September 30, 1996, enactment of the IIRIRA and the April 1, 1997, Title III-A effective date. At the time of his November 15, 1996, deportation hearing, the respondent fit into the category of "an alien who is in . . . deportation proceedings before the title III-A effective date." IIRIRA § 309(c)(1). The statute directs that the amendments in subtitle A "shall not apply" in the case of an alien in the respondent's circumstances. New section 241(a)(6) of the Act, invoked by the majority, is one of the Title III-A amendments that "shall not apply" in cases such as this.

The only obvious area of uncertainty arises from the present tense language of section 309(c)(1), describing an alien who "is" in proceedings "before" April 1, 1997. Viewed in isolation, the statute's use of this present tense verb raises the question of whether some of the Title III-A amendments could be deemed to apply after the order becomes administratively final, assuming the "proceedings" cease at that point and the alien no longer "is" in "proceedings."[2]

The Supreme Court, however, instructs us to avoid reading a statutory phrase in isolation. Rather, statutory language is to be construed within the overall context of the particular statute and in such a way as to give effect to the object and policy reflected in the statute's overall design. *See Holloway v. United States*, 526 U.S. 1, 119 S. Ct. 966, 969-71 (1999); *John Hancock Mut. Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 94-95 (1993); *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281 (1988).

At the outset, even a common sense reading of the language of section 309(c)(1), considered by itself, tells us that none of the Title III-A amendments applies to an alien in deportation proceedings before April 1, 1997

---

[2]It is not clear that the term "proceedings" in section 309(c)(1) is limited to the administrative hearing and appeal process before Immigration Judges and the Board (or similar proceedings before the Service).  Read as a whole, the general transitional rules are designed to continue prior law for persons placed in proceedings under prior law. One way to give effect to that overall design would be to read the word "proceedings" in section 309(c)(1) as covering the period beyond the date of the final order and extending to the actual physical removal of the alien, such that the respondent still "is" in "proceedings" today, because his deportation order has not yet been executed. This is the reading we gave to the word "proceedings" in the marriage fraud context in *Matter of Enriguez*, 19 I&N Dec. 554, 556 (BIA 1988). The interpretation of section 309(c)(1) set forth in the text, however, gives effect to that overall design while reading the word "proceedings" simply to include the hearing and appeal process.

(unless some more specific provision directs the application of new law in a particular setting). On the day of his November 15, 1996, hearing, the respondent fell within the statute's command that the Title III-A amendments "shall not apply." It would not be in harmony with this command to give overriding prominence to the present tense word "is" and to apply some or all of the Title III-A amendments once the order of deportation became final.

Giving too much prominence to the word "is" would distort the statute's obvious overall purpose. For example, the phrase "an alien who *is* in . . . deportation proceedings *before*" April 1, 1997, would not accurately describe any alien undergoing a deportation hearing *on or after* April 1, 1997, if controlling interpretative weight were given to the word "is." *See* IIRIRA § 309(c)(1). Once April 1, 1997, had arrived, no one could thereafter be in proceedings "before" April 1, 1997.

Nevertheless, a common sense reading of the statute tells us that the general transitional rules were not merely designed to postpone the application of the Title III-A amendments until April 1, 1997, for *all* aliens. Indeed, such a result could be achieved without any general transitional rule at all, because the Title III-A amendments, including the repeal of various provisions of former law, took effect on that date. Rather, they were designed to preserve prior law for aliens put into proceedings before April 1, 1997, and to preserve that law even after April 1, 1997, arrived. It does not matter that such an alien now has a final order or that the calendar has advanced and it "is" no longer "before" April 1, 1997.

In either case, it seems most appropriate to read the statutory language from the temporal perspective of when the proceedings were occurring. In other words, the Title III-A amendments "shall not apply" if, on the date the proceedings took place, it would be accurate to describe the individual in question as "an alien who is in exclusion or deportation proceedings before the title III-A effective date." IIRIRA § 309(c)(1). If this once correctly described the alien, neither the passage of time to and beyond April 1, 1997, nor the administrative finality of the order should affect the applicability of the Title III-A amendments to that alien.

The overall structure of the general transitional rules, as originally enacted and as amended, confirms what common sense tells us about how to read section 309(c)(1). In this respect, section 309(c)(3) of the IIRIRA provides:

> ATTORNEY GENERAL OPTION TO TERMINATE AND REINITIATE PROCEEDINGS.—In the case described in paragraph (1), the Attorney General may elect to terminate proceedings *in which there has not been a final administrative decision* and to reinitiate proceedings under chapter 4 of title II [of] the Immigration and Nationality act (as amended by this subtitle). Any determination in the terminated proceeding shall not be binding in the reinitiated proceeding. (Emphasis added.)

This allows for the termination of prior law deportation proceedings and the commencement of proceedings under the new removal provisions enacted by the IIRIRA. But this process is allowed only if "there has not been a final administrative decision" under the prior law. IIRIRA § 309(c)(3). The implication is unmistakable that prior law continues to apply in cases where a final administrative decision is obtained under prior law. *See also* IIRIRA § 309(c)(1)(B) (providing for judicial review of final exclusion and deportation orders to continue under prior law).

More than an unmistakable implication exists when consideration is given to amendments made to the general transitional rules by the Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, 111 Stat. 2193, *amended by* Pub. L. No. 105-139, 111 Stat. 2644 (1997) ("NACARA"). Section 203 of the NACARA, 111 Stat. at 2196, provides transitional rules for certain suspension of deportation cases under prior law and certain cancellation of removal cases under new law. Among other things, it enhances the ability of aliens from certain countries in Central America or Eastern Europe to obtain these forms of relief. The mere mention of suspension of deportation as a continuing form of relief confirms that prior law continues, even though no alien can presently be in a deportation proceeding "before" April 1, 1997.

Importantly, section 203(c) of the NACARA established a special motion to reopen procedure for aliens benefitted generally by the NACARA. It amended the general transitional rules of section 309 of the IIRIRA to add a new subsection (g), which provides in part that

> any alien who has become eligible for cancellation of removal or suspension of deportation as a result of the amendments made by section 203 of the Nicaraguan Adjustment and Central American Relief Act may file one motion to reopen removal or deportation proceedings to aplly for cancellation of removal or suspension of deportation.

NACARA § 203(c). This provision applies to aliens who are subject to final administrative orders, and it was made effective "as if included in the enactment" of the IIRIRA. NACARA § 203(f).

Included within the Title III-A amendments was the repeal of suspension of deportation. IIRIRA § 308(b)(7), 110 Stat. at 3009-615. Consequently, there would be no suspension of deportation provision available to aliens currently in deportation hearings or with final deportation orders if the Title III-A amendments applied to such aliens. It would be pointless for the statute to reference suspension of deportation or to provide a special reopening procedure to seek that form of relief if it had been repealed and was no longer available for aliens filing motions to reopen or having hearings on or after April 1, 1997.

Consequently, both a common sense reading of section 309(c)(1) of the IIRIRA itself and the overall scheme of the general transitional rules, as

amended by the Nurses Act and the NACARA, virtually compels the conclusion that none of the Title III-A amendments apply to the respondent here.

### III. THE DISSENT

Unlike the majority's decision, the concurring and dissenting opinion of Board Member Rosenberg ("dissent") does attempt to offer a rationale for applying the new law to the respondent's post-final-order custody determination. Evidently, the dissent would apply some of the Title III-A amendments to aliens in proceedings before the Title III-A effective date, but would do so only after the deportation orders became final, and would revert to *not* applying those amendments any time proceedings were reopened. This creative approach suffers from some serious problems, however.

The dissent fails to take into account the overall design of the general transitional rules in its formulation. It would bounce aliens back and forth between prior law and new law when nothing in the statute's design so suggests. Significantly, it fails to properly account for the statutory command in section 309(c)(1)(A) of the IIRIRA that the Title III-A amendments "shall not apply" to aliens such as the respondent. To achieve the result advocated by the dissent, it seems that this statutory language would need to say that the Title III-A amendments "shall not apply until the proceedings are concluded or at any time the proceedings are reopened."[3]

Most importantly, though, the dissent misapprehends the point of section 309(c)(1)(B). This provision does not limit application of the prior law to the time during which proceedings are being conducted. Rather, in conjunction with section 309(c)(1)(A), it preserves former law for aliens whose cases were started under former law, notwithstanding the amendments (including the repeal of some portions of former law) made by Title III-A. And it directs the application of that preserved former law to those very cases. In other words, contrary to the dissent's contention, section 309(c)(1)(B) does not confine the application of former law to the conduct of proceedings; rather, it acts more generally as a savings clause for former law and it directs the use of that former law in the cases to which it applies.

---

[3]The dissent also misapprehends the analysis in this concurring opinion. It is *not* my contention that the respondent continues to remain in proceedings for all purposes (although such a reading of the word "proceedings" could give effect to the design of the statute, as explained in footnote 2). In addition, the dissent's reliance on the title of the transitional rules section is misplaced. As originally enacted, the title of section 309(c) of the IIRIRA read "Transition For Aliens In Proceedings." This title, however, was changed by section 203(a)(2) of the NACARA, and now reads "Transition For Certain Aliens."

## IV. THE REGULATIONS

The majority looks to 8 C.F.R. § 241.4 (1999) for the criteria applicable in assessing continued custody in this case. This regulation, however, is included in Subpart A of Part 241, pertaining to aliens with orders of *removal*. The respondent has an order of *deportation* as a result of proceedings commenced before April 1, 1997. Significantly, separate regulatory provisions govern the deportation of aliens whose proceedings commenced prior to April 1, 1997, as exclusion or deportation proceedings. *See* 8 C.F.R. part 241, subpart B (applicable to the "Deportation of Excluded Aliens (for Hearings Commenced Prior to April 1, 1997)") and subpart C (applicable to the "Deportation of Aliens in the United States (for Hearings Commenced Prior to April 1, 1997)") (1999). Consequently, the structure of the regulations promulgated to implement the IIRIRA's provisions indicates that the previous law governs aliens who have final administrative orders arising from proceedings begun prior to the Title III-A effective date. These regulations would be unnecessary, and perhaps even improper, if all aliens with final administrative orders of any character were covered by new section 241(a) of the Act. The majority fails to acknowledge the existence of these regulations, let alone to explain how these provisions can validly coexist, in light of the majority's statutory determination, with the "removal" regulations it does invoke.

## V. THE CASE LAW

The majority relies on *Chi Thon Ngo v. INS, supra*, and *Zadvydas v. Underdown*, 185 F.3d 279 (5th Cir. 1999), as support for the result advanced by the parties. In *Zadvydas*, the court actually questioned whether current section 241(a)(6) of the Act properly applied in light of the general transitional rules, but it ultimately deferred to the Service's interpretation in accordance with *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843-44 (1984). The qualified *Chevron* deference the Service received in *Zadvydas*, however, is no substitute for an actual analysis of the statutory provisions at issue, especially when that analysis leads to a contrary conclusion.

The decision in *Chi Thon Ngo v. INS*, *supra*, moreover, provides no support for the majority here. That case involved an alien who had a final order of exclusion, and the court saw no practical difference in the law both before and after the amendments made by the IIRIRA. Consequently, the court found it unnecessary to analyze the statutory scheme to determine which law applied, since the result would be the same under either set of statutory provisions. The majority's reliance on *Chi Thon Ngo* is actually quite puzzling. It does *not* hold that current section 241(a)(6) governs cases such as that of the respondent here, nor does it support an avoidance of

statutory analysis in cases, such as this, where the statutory alternatives lead to different outcomes.


## VI. THE APPLICABLE STATUTE

Because the respondent was in deportation proceedings prior to April 1, 1997, the Title III-A amendments of the IIRIRA do not apply to his case. Therefore, current section 241(a)(6) of the Act, a Title III-A amendment, does not govern. Rather, his custody determination is governed by former section 242(a)(2) of the Act, 8 U.S.C. § 1252(a)(2) (1994), as in effect prior to April 1, 1997. This section, as amended by section 440(c) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1277 ("AEDPA"), and as further revised by section 306(d) of the IIRIRA, 110 Stat. 3009-612, provides as follows:

> The Attorney General shall take into custody any alien convicted of any criminal offense covered in section 241(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are, without regard to the date of their commission, otherwise covered by section 241(a)(2)(A)(i), upon release of the alien from incarceration, shall deport the alien as expeditiously as possible. *Notwithstanding paragraph (1) or subsection (c) or (d) the Attorney General shall not release such felon from custody.* (Emphasis added).

Subsections (c) and (d) of former section 242 generally provide for the release of an alien on supervision if the alien cannot be deported within 6 months. However, the last sentence of section 242(a)(2) of the Act overrides those general provisions of prior law for certain criminal aliens.[4] Thus,

---

[4]In this case, the Order to Show Cause was prepared on June 19, 1996, and we are informed by the parties that it was served on the respondent on July 18, 1996. The record does not show the date it was filed with the Immigration Court, but that filing could not have preceded its June 19, 1996, preparation. Judged by any of these dates, it is apparent that the respondent's deportation case was not pending on the April 24, 1996, date of the enactment of the AEDPA. Consequently, it does not presently appear necessary to consider the implications of the ruling in *Magana-Pizano v. INS,* 200 F.3d 603, (9th Cir. 1999) (declaring that section 440(d) of the AEDPA, amending former section 212(c) of the Act, does not apply to deportation cases pending on the date the AEDPA became law), even though the respondent's case arises within the United States Court of Appeals for the Ninth Circuit. Although the respondent asserts that on April 11, 1996, the Service notified California corrections officials of its intention to take the respondent into custody (presumably by means of a detainer), it does not appear that the lodging of a detainer alone would be considered to start his deportation case. *See Alanis-Bustamante v. Reno*, 201 F.3d 1303 (11th Cir. 2000) (stressing that the *combination* of serving an Order to Show Cause and filing a detainer effectively commenced proceedings); *Wallace v. Reno*, 194 F.3d 279 (1st Cir. 1999) (finding that the deportation process effectively begins when an Order to Show Cause is served on the alien).

under this prior but still applicable statute, there is no authority for us to order the release of an alien, such as the respondent, who has been convicted of an aggravated felony or of any other covered criminal offense and ordered deported on that basis.[5]

## VII. CONCLUSION

I agree that the respondent's appeal of his custody determination should be dismissed. Unlike the majority, however, I find that the respondent is subject to the terms of former section 242(a)(2) of the Act, not to current section 241(a)(6). The respondent was found deportable under former section 241(a)(2)(A)(iii) of the Act, and we are precluded by the former law from ordering his release from custody.

*CONCURRING OPINION:* Edward R. Grant, Board Member

I respectfully concur, as I agree with the ultimate decision that the respondent should not be released from detention. I fully subscribe to the concurring opinion of Board Member Filppu. I write separately to add further comment on the problematic nature of the Board's uncritical acceptance of the positions of the parties in this case.

As noted by Board Member Filppu, the provisions of section 241(a)(6) of the Immigration and Nationality Act, 8 U.S.C. § 1231(a)(6) (Supp. II 1996), being "new law" provisions included in Title III-A of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-575 ("IIRIRA"), cannot be applied to an alien such as the respondent who is in deportation proceedings commenced prior to April 1, 1997. Section 309(c)(1)(A) of the IIRIRA, 110 Stat. at 3009-625, specifically stated that "old law" cases initiated prior to April 1, 1997, were to be considered under existing provi-

---

[5]Any concerns about the constitutionality of long-term detention arising from the last sentence of former section 242(a)(2) are not for us to resolve, because we do not undertake to address the constitutionality of the statutes we administer. *See, e.g., Matter of C-,* 20 I&N Dec. 529, 532 (BIA 1992). It is worth noting, however, that the proper interpretation of the general transitional rules of the IIRIRA would not appear to raise any constitutional questions by itself. Those general transitional rules merely direct the application of either former or new law to various categories of aliens. Whether an alien gains any advantage from the category into which he or she falls does not depend on the terms of the transitional rules. It depends on the substantive requirements of either the former or new law, as the case may be, and on the given alien's particular circumstances.

sions, and that the Title III-A amendments "shall not apply" to such cases. Small wonder that the majority chooses not to explain how it can ignore this plain dictate. The apparent desideratum, to not create "'troubling precedents or dicta,'" is illusory. *Matter of Saelee,* 22 I&N Dec. 1258, at 1261 (BIA 2000) (quoting *Chi Thon Ngo v. INS*, 192 F.3d 390, 395 n.5 (3d Cir. 1999)). We *do* establish a precedent here; and parties in future cases will use it to urge to us to discard statutory mandates that they find disagreeable or inconvenient. If there is a "statutory gap" that requires a clarification of the mandatory detention provisions enacted in 1996, it is for Congress, not the Immigration and Naturalization Service, and not the Board, to provide that clarification.

In my view, the majority today compounds the error recently made in *Matter of Adeniji*, 22 I&N Dec. 1102 (BIA 1999), in which the Board ignored plain statutory language by accepting the joint position of the parties in order to avoid the application to a criminal alien of the mandatory custody provisions enacted twice by Congress in 1996. *See id.* at 20-24 (Grant, dissenting). It can at least be said of *Adeniji* that the Board attempted to provide a rationale for *why* the joint position urged by the parties was legally correct. Furthermore, while I believe the Board to have erred in *Adeniji*, it can also be said that there was *some* statutory ambiguity at issue in that case. In my view, that ambiguity would have been best resolved by a decision to continue to apply the Transition Period Custody Rules ("TPCR") established by section 303(b) of the IIRIRA, 110 Stat. at 3009-586, to the case of *any* alien released into Service custody during the effective period of the TPCR, regardless of whether the actual hearing on custody occurred after the expiration of the TPCR. *See Matter of Adeniji, supra*. A majority of the Board disagreed, holding that we could not read a "savings clause" into the TPCR. *Id.* I note my continuing regret over this decision, particularly because I believe that application of the TPCR could offer a solution to the problem of indefinite detention that this case would otherwise appear to present. That option, I recognize, is now foreclosed by *Adeniji*.

The problem, then, is that Congress, in enacting the IIRIRA and, in particular, the TPCR, failed to provide a complete "transition out" of the mandatory post-deportation-order detention provisions it had only recently enacted in the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"). Former section 242(a)(2) of the Act, 8 U.S.C. § 1252(a)(2) (1994), had required the post-final-order detention of an alien convicted of an aggravated felony, but also, under subparagraph (B), permitted release on a showing that such an alien is not a threat to the community and is likely to appear at future hearings. Section 440(c) of the AEDPA, 110 Stat. at 1277, amended this "old law" provision by expanding the categories of criminal aliens that must be detained and eliminating subparagraph (B), thus making such

1274

detention truly mandatory.[1]

The TPCR, as we have interpreted them, provided a strictly time-limited respite from the amendments made by section 440(c) of the AEDPA, as well as the "new law" mandatory detention provisions enacted by section 303(a) of the IIRIRA, 110 Stat. at 585, as new section 236(c) of the Act. The difference between "new" and "old" law cases upon the expiration of the TPCR, however, is significant. In "new law" removal cases, as explained in footnote 1, aggravated felons subject to mandatory detention during their proceedings by section 236(c), and after the entry of a final order of removal under section 241(a)(2) of the Act, could become eligible for release, under section 241(a)(6), in the event they are not actually removed from the United States within the removal period. *See* section 241(a)(1) of the Act. In "old law" cases, however, the expiration of the TPCR mandated a reversion to the provisions of former section 242(a)(2) of the Act, as amended by section 440(c) of the AEDPA. Under this former statutory scheme, there is no provision equivalent to current section 241(a)(6) of the Act, and Congress failed to supply a rule that would put criminal aliens subject to that scheme on an equal footing with aliens who were placed in proceedings after April 1, 1997. I reiterate, however, my view that whatever fault may lie with Congress in failing to close this particular loophole was exacerbated by our failure in *Matter of Adeniji* to allow a more flexible construction of the temporal scope of the ameliorative provisions in the TPCR.

---

[1]No detention provision of equivalent force had been included in the versions of the IIRIRA considered separately by the House of Representatives and the Senate in 1996. *See, e.g.,* Immigration in the National Interest Act of 1995, Report of the Committee on the Judiciary, House of Representatives, on H.R. 2202, H.R. Rep. No. 104-469, pt. 1, at 18-19 (1996). In the wake of the AEDPA amendments, however, the Conference Committee for the IIRIRA rewrote the detention provisions passed by the House and the Senate. This revision resulted in current section 236(c) of the Act, 8 U.S.C. § 1226(c) (Supp. II 1996), which mandates the detention of most criminal aliens from the time of their release from imprisonment into the custody of the Service. It also resulted in the creation of current section 241(a)(6) of the Act, the provision that the parties assert now governs the situation of the respondent.

While not essential to resolving this case, it is worth briefly noting the connection between current sections 236(c) and 241(a)(6). The former is a mandate, without exception, for the detention of criminal aliens while they are in removal proceedings. The latter, covering those criminal aliens who have been ordered removed, actually is more generous—it permits release from custody, as the majority explains, upon the satisfaction of certain conditions, which I agree are not met in this case. This "generosity," however, must be seen within the entire context of section 241. Specifically, section 241(a)(1)(A) states that an alien ordered removed shall be removed "within a period of 90 days" (the "removal period"), and section 241(a)(2) mandates the detention of *all* aliens ordered removed for the duration of this "removal period." Thus, the statutory scheme expresses an expectation that criminal aliens would remain detained during their proceedings, be removed within 90 days after the entry of a final order of removal, and only in anomalous circumstances remain in the United States long enough to be considered for potential release under section 241(a)(6) of the Act.

In conclusion, I agree that the respondent's appeal of his custody determination should be dismissed. However, I find that the majority's case is governed by former section 242(a)(2) of the Act, as amended by section 440(c) of the AEDPA, and that we are thus precluded from authorizing the respondent's release.

*CONCURRING OPINION:* Lori L. Scialabba, Vice Chairman

I respectfully concur with the majority's decision that the respondent has failed to present evidence to warrant his release from custody. However, as I find more persuasive the rationale in Board Member Lory D. Rosenberg's concurring and dissenting opinion for concluding that the respondent is statutorily eligible for release from post-final-order detention, I also concur with Part I of that opinion.

*CONCURRING AND DISSENTING OPINION:* Lory Diana Rosenberg, Board Member

I respectfully concur in part and dissent in part.

I concur with the majority's determination that we have jurisdiction over the respondent's appeal. I also concur with the majority's conclusion that the respondent, who was ordered deported on November 15, 1996, and has been detained by the Immigration and Naturalization Service for over 3 years, is eligible to be released from such post-final-order detention, pursuant to the provisions of section 241(a) of the Immigration and Nationality Act, 8 U.S.C. § 1231(a) (Supp. II 1996).

My concurrence, however, is based not only on the agreement of the parties that this particular respondent may be released under section 241(a)(6) of the Act, but on my reading of the statutory scheme applicable to all respondents who are detained by the Service pursuant to an order of deportation or removal that has become administratively final and whose deportation or removal has not been effectuated during the applicable removal period. Therefore, I write separately to address the statutory provisions, which I find to support the conclusion that the respondent is eligible to be released from post-final-order detention.

In addition, for the reasons discussed below, I do not agree that the majority has properly reviewed the district director's determination to continue to detain the respondent under section 241(a)(6) of the Act, or that the majority has adequately considered the factors relevant to the respondent's eligibility for post-final-order release. Therefore, while I join the majority opinion with respect to the respondent's statutory eligibility to be released from post-final-order detention, I dissent with respect to that portion of the majority opinion denying release at this time.

1276

## I. AUTHORITY FOR POST-FINAL-ORDER
## RELEASE FROM DETENTION

On November 15, 1996, an Immigration Judge found the respondent deportable based on his December 28, 1992, conviction for an aggravated felony and ordered him deported from the United States. In the 3 years and 3 months since the deportation order became administratively final,[1] the order of deportation to Denmark, with an alternate order of deportation to Laos, has not been effectuated, and the record contains no evidence that the Service has attempted to effectuate the order.

### A. Jurisdiction

As a preliminary matter, the Service contends that we do not have jurisdiction over the respondent's appeal, because it claims that the district director's review of the respondent's custody status was conducted sua sponte and not as a result of any request by the respondent. This contention lacks merit both as a matter of fact and as a matter of law.

First, the Service's claim that the district director's November 6, 1998, review of the respondent's custody status was sua sponte in nature is not substantiated by the record. As a factual matter, the record indicates that the district director undertook review of the respondent's custody status only after the respondent filed a writ of habeas corpus in the federal district court seeking to be released from post-final-order detention by the Service. According to documents in the record before us, the respondent agreed to be interviewed by the Service with respect to his eligibility for release from detention as part of a negotiated settlement of the respondent's habeas corpus action.

The timing of the Service's review of the respondent's custody status certainly suggests that what motivated the review was the respondent's action seeking a writ ordering his release from detention. I can find no basis on which to credit the Service's claim that such consideration was "sua sponte," or to attribute the district director's first review in the 2 years since the respondent's deportation order became administratively final to mere coincidence.

---

[1]The respondent did not appeal the order of the Immigration Judge to the Board of Immigration Appeals. 8 C.F.R. § 3.39 (1999); *see also* 8 C.F.R. §§ 3.3, 3.38, 240.53 (1999). Accordingly, he did not exhaust his administrative remedies and was not statutorily eligible to seek judicial review, nor did he seek such review. *See* former section 106(c) of the Act, 8 U.S.C. § 1105a(c) (1994); *see also* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, § 309(c)(4), 110 Stat. 3009-546, 3009-626 ("IIRIRA").

Second, nothing in 8 C.F.R. §§ 236.1(d)(2)(ii) or (3)(iii) (1999) justifies reading the regulations to require that the respondent initiate the district director's post-final-order custody review in order to be entitled to appeal that determination to the Board of Immigration Appeals. Nevertheless, even if such a reading was warranted, the respondent's filing a petition in federal district court to redress his liberty interests and seek release from Service detention certainly amounts to action that may be deemed to initiate a request for the custody determination that ultimately was conducted by the Service.

As the majority correctly concludes, 8 C.F.R. § 236.1(d)(3)(iii) does not limit our jurisdiction only to review of a district director's post-final-order custody determination that was "initiated" by the alien. *Matter of Saelee,* 22 I&N Dec. 1258, at 1260 (BIA 2000). Accordingly, the regulation confers jurisdiction on the Board to review the district director's decision regarding the respondent's release from post-final-order detention.

## B. Eligibility for Post-Final-Order Review and Release When a Removal Order Cannot Be Effectuated

The substantive legal issue before us is two pronged. The first prong of the issue is whether the statute provides a basis on which the respondent, who has been convicted of a crime found to be an aggravated felony and who was ordered deported in proceedings that were conducted and completed before April 1, 1997, may be released from post-final-order detention pending removal.

I agree with the majority's conclusion that the respondent should be treated as eligible for release from post-final-order detention under section 241(a)(6) of the Act. However, the majority does not provide any reasons for its conclusion in this regard other than to state that the parties agree that the respondent is eligible for release, and that one of the two circuit courts to have addressed the issue has noted that resorting to a close examination of the various statutes involved might "'create troubling precedents or dicta.'" *Matter of Saelee, supra*, at 1261 (quoting *Chi Thon Ngo v. INS*, 192 F.3d 390, 395 n.5 (3d Cir. 1999)).

At the heart of our determination regarding the respondent's eligibility for release from detention is whether the terms of section 241(a) of the Act apply to the respondent, who was "in . . . deportation proceedings *before* the title III-A effective date." Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, § 309(c)(1), 110 Stat. 3009-546, 3009-625 ("IIRIRA"), *amended by* Pub. L. No. 104-302, § 2, 110 Stat. 3656, 3657 (1996) (emphasis added) (referring to the transition rules, which preserve the applicability of prior provisions of the Act to certain aliens after the April 1, 1997, effective date of the new provisions contained in Title III-A of the IIRIRA). For the reasons stated

below, I conclude that section 309(c)(1) of the IIRIRA does not preclude the application of section 241(a) of the Act to individuals who are presently detained pursuant to a final administrative order of deportation or removal that has not been effectuated.[2]  Therefore, I find that section 241(a)(6) of the Act governs the post-final-order custody determinations made in the case of an individual, such as the respondent, who is removable on the basis of his conviction for an aggravated felony.

## 1. Current Statutory Language Governing Release From Post-Final-Order Detention

The enactment of the IIRIRA introduced a new provision governing removal and post-final-order detention. Section 241(a)(1)(A) of the Act provides that "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (. . . referred to as the 'removal period')."  The removal period is defined as beginning on "(i) [t]he date the order of removal becomes administratively final," or "(ii) [i]f . . . judicially reviewed and if a court orders a stay of removal of the alien, the date of the court's final order," or if the alien is detained by an authority other than the Service, "(iii) . . . the date the alien is released from detention or confinement."  Section 241(a)(1)(B) of the Act.

Section 241(a)(2) of the Act mandates detention pending removal during the 90-day removal period,[3] providing as follows:  "During the removal period, the Attorney General shall detain the alien."  That section also pro-

---

[2]Section 309(d)(2) of the IIRIRA, 110 Stat. at 3009-627, entitled "Transitional References," states that "any reference in law to an order of removal shall be deemed to include a reference to an order of exclusion and deportation or an order of deportation." Thus, the statute covers exclusion and deportation orders issued both before and after April 1, 1997, resulting from exclusion and deportation proceedings that were pending before April 1, 1997.

[3]Until recently, the Attorney General was generally not authorized to detain any alien subject to a final order of deportation for more than 6 months following entry of the order. *See* former section 242(c) of the Act,  8 U.S.C. § 1252(c) (1988).  In 1990, Congress mandated detention of any alien convicted of an aggravated felony. *See* former section 242(a)(2)(A) of the Act, 8 U.S.C. § 1252(a)(2)(A) (Supp. II 1990); Immigration Act of 1990, Pub. L. No. 101-649, § 504(a), 104 Stat. 4978, 5049. Thereafter, effective in 1990, Congress imposed a limited exception to the 6-month rule, mandating that the Service continue to detain a lawfully admitted deportable alien who had been convicted of an aggravated felony "unless the alien demonstrates that he is neither dangerous nor a flight risk." *See* former section 242(a)(2)(B) of the Act, 8 U.S.C. § 1252(a)(2)(B) (1994); Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, § 306(a)(4), 105 Stat. 1733, 1751. The "unless" provision was repealed on April 24, 1996, by section 440(c) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1277 ("AEDPA"), which made detention of such aliens absolutely mandatory.

vides that "*[u]nder no circumstances during the removal period shall the* Attorney General release an alien who has been found inadmissible under section 212(a)(2) or 212(a)(3)(B) or deportable under section 237(a)(2) or 237(a)(4)(B)." Section 241(a)(2) of the Act (emphasis added).[4]

When the 90-day removal period expires, however, detention is not mandatory. In fact, indefinite detention is not expressly authorized in any case. Specifically, when "the alien does not leave or is not removed within the removal period," the statute provides that the alien "*shall be subject to supervision* under regulations prescribed by the Attorney General." Section 241(a)(3) of the Act (requiring periodic appearances before an immigration officer, any necessary mental or physical examinations, provision of certain information under oath, and compliance with restrictions on conduct or activities) (emphasis added).

Section 241(a)(6) of the Act constitutes an exception to the rule in section 241(a)(3) that an alien who is not removed within the removal period shall be released on supervision. It provides:

> An alien ordered removed who is inadmissible under section 212, removable under section 237(a)(1)(C), 237(a)(2), or 237(a)(4) or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, *may be detained beyond the removal period* and, if released, shall be subject to the terms of supervision in paragraph (3).

Section 241(a)(6) of the Act (emphasis added). Thus, an alien who is inadmissible, or who is removable either for having entered without inspection or because of certain criminal convictions or security violations, or who is determined to be a risk to the community or unlikely to comply with the removal order may be detained beyond the 90-day removal period. However, such an alien also may be ordered released, and if released, is subject to supervision under section 241(a)(3) of the Act.

## 2. Effect of the IIRIRA's Transitional Rules and Applicability of Section 241(a) of the Act

The respondent was charged with deportability under former section 241(a)(2)(A)(iii) of the Act, 8 U.S.C. § 1252(a)(2)(A)(iii) (1994), on the basis of his conviction for a crime defined as an aggravated felony, and the proceedings in his case were conducted and completed on November 15, 1996.

---

[4]The "under no circumstances" language suggests that Congress contemplated that the Attorney General might order some releases during the 90-day removal period, as the provision goes on to preclude release absolutely in the case of an individual who is inadmissible on the particular criminal or terrorist activity grounds listed in the statute, or who is deportable on comparable grounds. Section 241(a)(2) of the Act.

Therefore, it is indisputable that the respondent was "in deportation . . . proceedings before" April 1, 1997, the effective date of the new provisions enacted under Title III-A of the IIRIRA. IIRIRA § 309(c)(1), *amended by* Pub. L. No. 104-302, § 2, 110 Stat. 3656, 3657 (enacted Oct. 11, 1996; effective Sept. 30, 1996); *see also* IIRIRA § 309(a), 110 Stat. at 3009-625.

Section 309(c) of the IIRIRA specifically addresses how proceedings that were initiated prior to the enactment and effective dates of the IIRIRA shall be conducted in light of the amendments to the Act. With certain potential exceptions not applicable here, the IIRIRA's transitional rules provide that "in the case of an alien who *is in* exclusion or deportation proceedings *before* the title III-A effective date—(A) the amendments made by this subtitle shall not apply." IIRIRA § 309(c)(1)(A) (emphasis added). These rules effectively ease the transition from the former statute to the amended statute, by clarifying which provisions apply to cases that were ongoing or "in the pipeline" when the IIRIRA was enacted. *See Matter of G-N-C-,* 22 I&N Dec. 281 (BIA 1998) (Rosenberg, concurring and dissenting).

Notably, however, section 309(c)(1)(B) of the IIRIRA also provides that "the proceedings (including judicial review thereof) *shall continue to be conducted* without regard to such amendments." (Emphasis added.) This language indicates strongly that the transitional rules were meant to apply to the literal continuation of deportation and exclusion proceedings that were initiated before the April 1, 1997, effective date of the Title III-A amendments. Congress also expressly defined such "proceedings" to include any judicial review of such exclusion and deportation proceedings. *See* IIRIRA § 309(c)(1)(B); *see also* IIRIRA § 309(c)(4), 110 Stat. at 3009-626 (providing transitional rules for judicial review).

Accordingly, reading the section 309(c)(1) phrase "is in . . . proceedings before" to cover proceedings (and judicial review of such proceedings) that were pending before April 1, 1997, without regard to when they concluded, is consistent with the intent of Congress to ease the transition to the new law.[5] But we cannot ignore Congress' mandate that such proceedings "shall continue to be conducted." IIRIRA § 309(c)(1)(B). The real question is whether the proceedings to determine the respondent's eligibility for release from Service detention, i.e., the instant custody proceedings, are those that Congress intended shall "continue to be conducted" without regard to the IIRIRA amendments. *Id.*

In the instant case, there are no ongoing "proceedings" relating to the respondent's excludability or deportability that are subject to the statute's mandate that such proceedings "shall continue to be conducted" without

---

[5]In my view, the concurrence of Board Member Filppu misses the point in focusing on the parties' reference to the temporal phrase "as of," which appeared in the transitional rules before a technical correction replaced that phrase with the term "before."

regard to the amendments enacted in Title III-A of the IIRIRA. Ongoing exclusion or deportation proceedings are conducted to determine whether an alien has violated the immigration laws and whether he or she is eligible for any form of relief from exclusion or deportation. *See, e.g.,* section 240(a)(1) of the Act, 8 U.S.C. § 1229a(a)(1) (Supp. II 1996); 8 C.F.R. §§ 240.1, 240.11 (1999); *see also Foti v. INS,* 375 U.S. 217 (1963). The respondent's deportation proceedings came to a close when he failed to appeal the decision of the Immigration Judge to the Board and did not seek judicial review. *See* 8 C.F.R. § 3.39 (1999); *see also supra* note 1. There have been no ongoing proceedings in the respondent's case relating to his deportability since December 15, 1996, at the very latest, as this is the date on which the respondent would have had to file an appeal to the Board seeking review of the deportation order entered by the Immigration Judge. *See* 8 C.F.R. § 3.38 (1999); *see also* 8 C.F.R. § 3.3 (1999).

Moreover, the determination of the respondent's post-final-order custody status is not a part of the "exclusion or deportation proceedings" referred to in section 309(c)(1) of the IIRIRA. Detention pending or following a determination of deportability always has been treated as an adjudication that is collateral to the proceeding in which deportability is determined. *See* C.F.R. § 3.19(d) (1999); *Matter of Adeniji*, 22 I&N Dec. 1102, at 1115 (BIA 1999) ("Custody proceedings must be kept separate and apart from, and must form no part of, removal proceedings."). Thus, I do not find section 309(c)(1) of the IIRIRA to preclude the application of section 241(a)(6) of the Act to determine the respondent's post-final-order custody status.

Board Member Filppu (who characterizes his separate opinion as a concurrence because he agrees with the majority's conclusion that the respondent should not be released, but disagrees with the legal holding in this case) argues that section 241(a)(6) of the Act cannot apply to the respondent because he once was an individual who "is in" proceedings "before" April 1, 1997. According to Board Member Filppu, once "in proceedings," the respondent essentially remains "in proceedings" and subject to the terms of section 309(c)(1) of the IIRIRA transition rules for all purposes. This reading of the relevant statutory provisions is untenable for several reasons.

First, as discussed above, consideration of the very purpose of the transitional rules undermines any contention that these provisions bar section 241(a) of the Act from applying to the cases of aliens detained pending removal, long after issuance of a final order of deportation. As the title of the transitional rules section plainly indicates, its provisions were intended to provide guidance as to the appropriate law to be applied to certain aliens whose exclusion or deportation proceedings were initiated before the provisions of Title III-A of the IIRIRA became effective, and whose proceedings are continuing to be conducted even after April 1, 1997. Notably, the concept that such proceedings are those that still are being "conducted" is

not addressed in the Board Member's opinion. *Cf. Chi Thon Ngo v. INS, supra*, at 395 ("It is arguable that since a final order of exclusion had been entered against petitioner before the effective date, he was no longer 'in exclusion proceedings,' and therefore, that the amended Act does not govern his situation."); *Zadvydas v. Underdown*, 185 F.3d 279, 286 & n.7 (5th Cir. 1999) (finding the "before" language ambiguous and deferring to the interpretation that section 309(c)(1) of the IIRIRA does not apply to proceedings that were not pending on the effective date of the IIRIRA).

Second, the transitional rules provide that such ongoing exclusion or deportation proceedings would be allowed to come to a close under the provisions that existed in the former statute, which governed those proceedings at their inception, unless the Attorney General made a specific decision to override the inapplicability of the IIRIRA at particular stages of the ongoing proceedings. The inclusion of exceptions allowing the Attorney General to apply the new law to cases in which no evidentiary hearing has been held, or to terminate the former proceedings and initiate removal proceedings under the IIRIRA in cases not yet administratively final, does not detract from this construction. *See* IIRIRA §§ 309(c)(2), (3), 110 Stat. at 3009-626. Board Member Filppu argues that, in light of the latter exception, "[t]he implication is unmistakable that prior law continues to apply in cases where a final administrative decision is obtained under prior law." *Matter of Saelee, supra,* at 1266 (Filppu, concurring). However, that begs the question, as prior law applies to proceedings that still are being conducted. When proceedings are not being conducted, as is the case here, there is no basis on which to argue that prior law should apply.

Third, our determination that the transition rules do not apply with regard to the post-final-order detention provisions in the current statute would not compromise an alien's eligibility to reopen his or her hearing on the basis that such reopening for relief under the former statute was warranted. Even after a deportation order becomes final, an alien ordered deported may seek to reopen his or her proceedings, as the general period for reopening provided by the regulations is 90 days following issuance of an order by the Immigration Judge or the Board. Should an alien submit and prevail on such a claim, his or her proceedings are reopened. At that point, an ongoing exclusion or deportation proceeding resumes and, according to section 309(c)(1) of the IIRIRA, the former law controls.

Consequently, Board Member Filppu's contention that his reading of the transitional rules is supported by section 203(c) of the Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, 111 Stat. 2193, 2196, *amended by* Pub. L. No. 105-139, 111 Stat. 2644 (1997) ("NACARA"), has little force. He argues that since section 203(c) of the NACARA establishes a special motion to reopen procedure for certain aliens who are subject to a final administrative order to apply for suspension of deportation, this "confirms that prior law continues" to apply to

an administratively final order, because "there would be no suspension of deportation provision available to aliens . . . with final deportation orders if the Title III-A amendments applied to such aliens." *Matter of Saelee, supra*, at 1266 (Filppu, concurring). However, as noted above, once such a motion is granted, the proceedings are again ongoing or pending, and the terms of section 309(c)(1) of the IIRIRA apply.

## II. RESPONDENT'S ELIGIBILITY FOR
## POST-FINAL-ORDER RELEASE

The second prong of the substantive issue presented by the respondent's appeal is whether section 241(a)(6) of the Act authorizes the Service to continue to detain him and whether he should be released. As established above, the statutory language of section 241(a) neither mandates the respondent's detention after the removal period nor authorizes it to continue indefinitely. As discussed below, the individual determination that the respondent shall not be released is erroneous.

### A. Criteria for Release from Post-Final-Order Detention
### Beyond the Removal Period

A fundamental principle of statutory construction provides that "[w]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). That principle is applicable in the instant case.

As the district court found in *Sok v. INS*, 67 F. Supp. 2d 1166 (E.D. Cal. 1999), "Construing § 1231(a)(6) as vesting the Attorney General with the authority to detain deportable aliens beyond the removal period with no fixed-time limitations would raise a serious constitutional question." *Id.* at 1168 (citing *Mathews v. Diaz,* 426 U.S. 67, 77 (1976) (holding that Congress may not disregard constitutional rights of aliens to life, liberty, and property without due process of law); *Phan v. Reno*, 56 F. Supp. 2d 1149, 1154 (W.D. Wash. 1999); *Tam v. INS*, 14 F. Supp. 2d 1184, 1192 (E.D. Cal. 1998)); *see also United States v. Witkovich*, 353 U.S. 194, 199, 201 (1957) (interpreting former 8 U.S.C. § 1252 restrictively to limit the information that an alien whose "deportation has not been effected within six months after it has been commanded" must provide to the Attorney General pending deportation, because giving the statute a broader meaning "would raise doubts as to the statute's validity"); *cf. Zadvydas v. Underdown, supra*, at 297 ("We hold that the government may detain a resident alien . . . *while good faith efforts to*

*effectuate the alien's deportation continue* and reasonable parole and periodic review procedures are in place." (emphasis added)).

Similarly, in *In re: Indefinite Detention Cases*, 82 F. Supp. 2d 1098 (C.D. Cal. 2000), the district court found that the three regulatory interests advanced by the Service in detaining an individual who is subject to a final order of removal—ensuring removal, preventing flight, and protecting the public—must be balanced against the deprivation of that individual's liberty.[6] *Id.* at *2 (citing *United States v. Salerno*, 481 U.S. 739, 747 (1987) (referring to "permissible" regulatory goals); *see also Reno v. Flores*, 507 U.S. 292, 301-02, 316 (1993) (O'Connor, J., concurring) (discussing the heightened scrutiny required, as immigration detention threatens a fundamental liberty interest); *Foucha v. Louisiana*, 504 U.S. 71 (1992) (regarding involuntary commitment). I find these analyses persuasive.

According to this reading of the statute, the first determination to be made in reviewing the respondent's custody status is "whether petitioner's continued detention violates § 1231(a)(6)." *Sok v. INS, supra*, at 1170. Although the majority states that it is not clear whether the Service has made any effort to execute the deportation order in the respondent's case, the record contains no evidence that the Service has taken any steps to remove the respondent during the 3 years that it has detained him beyond the 90-day removal period. Such apparent inaction certainly has a bearing on whether there is a "reasonable possibility that removal will be effected in the foreseeable future." *Id.* at 1169. Even under the broader reading of the court in *Zadvydas v. Underdown, supra*, there must be some evidence that good faith efforts are being made to effectuate the order. Therefore, at the very least, the reasonable possibility that the respondent's removal will be effectuated in the foreseeable future is a significant factor that must be weighed in the course of considering whether the respondent shall be released from detention, and the terms of that release. *See In re: Indefinite Detention Cases, supra.*

Assuming that the Service can establish a reasonable possibility of removal in the foreseeable future, or at least, that good faith efforts to effectuate the respondent's removal are in process, the respondent's release is subject to 8 C.F.R. § 241.4(a), which sets forth a nonexclusive list of nine factors that may be considered in determining release from detention following issuance of a final administrative order of removal. Notably, section 241(a)(6) provides simply that "[a]n alien . . . who has been determined by the Attorney General to be a risk to the community or unlikely to comply

---

[6]The district court found the latter two interests "incidental to [the] primary objective" of ensuring the removal of the alien from the country. *In re: Indefinite Detention Cases, supra,* at 1101 ("The detention of aliens ordered deported is not a matter of immigration policy but domestic interests, i.e., chiefly the prevention of flight and the protection of the community.").

with the order of removal may be detained." *Cf.* former section 242(a)(2)(B) of the Act, 8 U.S.C. § 1252(a)(2)(B) (1994) (absolutely prohibiting release from custody of any lawfully admitted alien who had been convicted of an aggravated felony, either before or after a determination of deportability, *unless* the alien demonstrates that he is neither dangerous nor a flight risk).

However, the regulation imposes on the alien the burden of demonstrating "by clear and convincing evidence that the release would not pose a danger to the community or a significant flight risk." 8 C.F.R. § 241.4. As we are bound by the regulations, the issue of whether those regulations impermissibly exceed the scope of the statute will not be resolved in this forum. Therefore, I must proceed to evaluate the evidence before us according to the standard articulated in the regulations.

### B. Respondent's Eligibility for Release From Detention

I agree with the majority that the district director's decision "is not sufficiently analytical." *Matter of Saelee, supra*, at 1262. In fact, the district director's decision could not survive review for abuse of discretion, as it fails to reflect that the significant favorable factors in the respondent's case were carefully considered and weighed against the significant adverse factors. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 491 (1951) (holding that an adjudicator's conclusions are expected to take into account, and reflect in his or her decision, consideration of both those facts in the record that support the conclusion and the evidence in the record that detracts from it).

The district director's determination is defective in form in that it does not provide a clear statement of the facts and law considered, or an adequate explanation of the district director's reasoning. In making a discretionary immigration decision, the agency must indicate "how it weighed the factors involved" and "how it arrived at its conclusion." *Dragon v. INS*, 748 F.2d 1304, 1307 (9th Cir. 1984); *see also Matter of A-P-,* 22 I&N Dec. 468 (BIA 1999); *Matter of M-P-,* 20 I&N Dec. 786 (BIA 1994). It also is defective in substance because there is no evidence that the district director actually considered the favorable factors or evaluated the favorable and adverse factors cumulatively as required. An agency abuses its discretion if it fails to show proper consideration of all factors when weighing equities and denying relief. *Cerrillo-Perez v. INS*, 809 F.2d 1419, 1422 (9th Cir. 1987); *see also Rarogal v. INS,* 42 F.3d 570, 572 (9th Cir. 1994) (stating that a denial of relief constitutes an abuse of discretion if the decision does not reflect "'proper consideration of all factors'" (quoting *Mattis v. INS*, 774 F.2d 965, 968 (9th Cir. 1985))).

However, I disagree with the result reached by the majority after conducting what it describes as a "de novo" review of the record. I find that the majority's decision is inadequate for many of the same reasons that the

majority is critical of the district director's determination. The majority has not based its opinion on a complete and accurate recitation of the favorable and adverse factors in the record, nor has it properly weighed and balanced the positive and negative factors of record.

Although the majority recites a list of the favorable and adverse factors attributable to the respondent for purposes of his release from custody, it does not really articulate all of the relevant factors. The majority states only that the positive factors demonstrated by the respondent are "some efforts at self-improvement while in prison and . . . some potential for employment and integration into the community if released." *Matter of Saelee, supra*, at 1263. As negative factors, the majority states that the record reflects that the respondent "has not clearly demonstrated remorse or understanding of the seriousness of his violent behavior." *Id.*

However, the respondent's crime was committed 8 years ago. It was committed when the respondent was 18 years old. It was committed before the respondent's own family had been the victim of a similar crime. Nowhere does the majority's determination reflect consideration or weighing of these factors. A listing of "years-old convictions" is an insufficient basis on which to deny release. *Chi Thon Ngo v. INS, supra*, at 398 (referring to 10-year-old convictions for firearm attempted robbery and bail jumping offenses).

In particular, whether the respondent poses a "danger to the community" involves an evaluation of his circumstances according to a standard that has been interpreted and articulated. The majority opinion makes no mention of the governing standard or its interpretation and application in relevant precedent decisions of the Board and the Ninth Circuit. *See Matter of Noble,* 21 I&N Dec. 672 (BIA 1997); *Matter of Drysdale*, 20 I&N Dec. 815 (BIA 1994). The majority also fails to explain why it has concluded that the adverse factors, which it finds to dominate and overwhelm the factors favoring release, establish that the respondent constitutes a danger to the community and precludes release under any conditions. *Cf. In re: Indefinite Detention Cases, supra* (citing *United States v. Witkovich, supra*, at 199-200 (addressing requirements that may be imposed on an alien ordered deported who cannot be removed)).

Moreover, there is no evidence on this record that the majority considered whether the conduct was likely to be repeated or whether any repetition of such conduct could be discouraged by requiring appropriate surety or imposing other conditions of release. *See In re: Indefinite Detention Cases, supra* (citing *United States v. Witkovich, supra*, at 199-200). The majority merely cited to a 6-year-old probation report indicating that, *at that time*, in 1993, the respondent did not appear to appreciate the mental anguish he had caused one of the victims of his crime.

Although this ostensibly is relied upon to indicate that the respondent is a danger to the community today, there is nothing in the record to indi-

cate the respondent's outlook today, or the qualifications of the individual who prepared the report to forecast the respondent's attitude or disposition toward crime 7 years later. By contrast, the majority does not indicate how it weighed the more contemporaneous reports indicating that the respondent received good behavior credits while in prison, or that he was deemed eligible for release into society by the state authorities 3 years before the actual completion of his sentence, or that an Immigration Judge found him eligible for release from detention on $5,000 bond.

As the court stated in *Chi Thon Ngo v. INS, supra*, at 398, while the conviction may still be relevant, "[d]ue process is not satisfied . . . by rubberstamp denials based on temporally distant offenses." The court went on to clarify that "[w]e do not intend to create a new legal fiction that allows for de facto indefinite detention based upon reviews that are comprehensive in theory but perfunctory in fact." *Id.* at 399.

I cannot agree that the majority's determination is based on a reasoned evaluation and fair balancing of the criteria set forth in the regulation. To the contrary, I find that the respondent is not a danger to the community or a flight risk based on the cumulative evidence relating to the respondent's conviction, his good behavior and rehabilitation, his family ties, the passage of time since his crime, and other favorable evidence in the record.

### III. CONCLUSION

A reasonable construction of the statute supports the majority's conclusion. This construction, posited above, is consistent with the statutory scheme as a whole and avoids the potential constitutional problem that would flow from reading the statute to require mandatory indefinite detention of aliens subject to final administrative orders of deportation or removal. Applying the terms of section 241(a)(6) of the Act and the corresponding regulations to the evidence in the record warrants ordering the respondent released from detention pending any future effectuation of his removal.